**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

KEVIN DEESE,
Address withheld consistent with Motion to
Proceed Under Pseudonym filed
contemporaneously herewith,

and

JOHN DOE,
Address withheld consistent with Motion to
Proceed Under Pseudonym filed
contemporaneously herewith,

        Plaintiffs,

    v.

JAMES N. MATTIS, in his official capacity as
Secretary of Defense,
1000 Defense Pentagon
Washington, D.C. 20301-1000;

RICHARD V. SPENCER, in his official
capacity as Secretary of the Navy,
1000 Navy Pentagon
Washington, D.C. 20350-1000;

WALTER E. CARTER, JR., in his official
capacity as Superintendent of the United States
Naval Academy,
121 Blake Road
Annapolis, Maryland 21402
County of Residence:  Anne Arundel

ROBERT B. CHADWICK, in his official
capacity as Commandant of the United States
Naval Academy,
121 Blake Road
Annapolis, Maryland 21402
County of Residence:  Anne Arundel

Civil Action No.: ___18-cv-2669___

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

(continued on next page)

HEATHER A. WILSON, in her official
capacity as Secretary of the Air Force;
1670 Air Force Pentagon
Washington, D.C. 20330-1670;

and

The UNITED STATES DEPARTMENT OF
DEFENSE,

                    Defendants.

1.      Plaintiffs Kevin Deese and John Doe,[1] by and through their attorneys, bring this action for declaratory and injunctive relief stemming from their unconstitutional and improper discharges from the United States Navy (the "Navy") and United States Air Force (the "Air Force"), respectively.  Deese and Doe were discharged from the U.S. Armed Forces solely because they are living with the human immunodeficiency virus ("HIV").

## STATEMENT OF THE CASE

2.      Members of the U.S. Armed Forces embody the best of the American spirit.  They sacrifice to serve and defend us for love of country and community.  In return, our military has made sacred promises to treat them with respect, dignity, and fairness.

3.      One condition, however, has led certain officials in the military to arbitrarily renege on that promise.  Asymptomatic HIV has been diagnosed in a significant number of active duty service members.  Contrary to widespread misunderstandings about HIV, a new diagnosis does not have the same ramifications as it did when HIV first entered the public consciousness decades ago.  For most people living with HIV, medication renders their HIV entirely inconsequential to their daily lives.  Those who adhere to these medications have no symptoms or significant effects on their immune systems and reach a suppressed viral load, making it impossible to transmit HIV.  With access to basic health care, those found medically fit for duty continue to contribute meaningfully to the military and to their country just as any other service member would.

4.      The Department of Defense ("DoD") has clear policies and regulations, dating back to 1988, to retain those who are diagnosed with HIV while on active duty.  Recognizing the important contributions of service members living with HIV, the Navy now evaluates service

---

[1] Plaintiff Doe's motion to proceed in this case under a pseudonym has been filed contemporaneously herewith.

members on a case-by-case basis for some overseas and operational assignments, including on ships, submarines, and aircraft carriers.  And, as of late 2017, the Air Force has allowed at least 13 airmen living with HIV to serve overseas and support vital missions.  Indisputably, these service members are fit for duty, have needed skills to contribute, and are able to manage their HIV without it affecting their duties.[2]

5.      Unfortunately, current military policies make service members with HIV who are allowed to deploy the exception rather than the rule, despite the fact that one's HIV status has no effect on deployability for the vast majority of service members with HIV.  Requiring service members to secure a waiver or exception to policy from those without medical training or a complete understanding of HIV in 2018 inevitably leads to discrimination in many instances.  This case highlights two such examples, in which certain Naval and Air Force personnel ignored the recommendations of their own medical officers and operational commanders when they arbitrarily and wrongly separated a midshipman and a cadet who were deemed medically fit to serve.

6.      In April 2014, just one month before graduating from the U.S. Naval Academy ("USNA") and realizing his dream of commissioning as a Naval officer, Plaintiff Deese was informed that additional medical tests he had undergone to participate in an elite dive program revealed he was HIV positive.  Based on his HIV status, he was told he would not be commissioned as an officer in the Navy upon graduation.  Deese was not given any option to be evaluated by a medical or physical review board or to request a waiver to commission.

---

[2] According to DoD publications, from 2011 to 2016, the Navy diagnosed 388 sailors and the Air Force diagnosed 181 airmen with HIV.  In 2016, 266 of those sailors—more than 68%—and 119 of those airmen—more than 65%—were still serving.  In 2011, the U.S. Army counted 480 soldiers with HIV serving on active duty, with some serving for more than 20 years after they were diagnosed.

2

7.      After graduation, Deese obtained numerous letters of recommendation and support for a waiver to commission as an officer of the Navy from his treating physician and several individuals in his line of command who were aware of his HIV status, including an endorsement from USNA Superintendent Carter.  Nevertheless, Deese was separated from the Navy on March 15, 2017, solely because of his HIV status.

8.      After enlisting in the Air Force in 2009 and serving with distinction for years, Plaintiff Doe secured a coveted appointment to the U.S. Air Force Academy ("USAFA") in 2012.  Mid-way through his second year, Doe was diagnosed with HIV during a routine military medical examination.

9.      In accordance with military regulations and procedures, Doe was evaluated by military medical professionals to determine whether he was medically fit to serve.  He was found fit for duty and received a waiver as to his HIV diagnosis to return to duty and to continue his education at the USAFA.  In the two years that followed, he was evaluated twice more for routine follow-ups, each time being found medically fit for duty.

10.     On June 2, 2016, Doe graduated from the USAFA and took the officer's oath. Ultimately, however, his commission was revoked, and on or about November 1, 2016, he was separated from the Air Force solely because of his HIV status.

11.     Navy and Air Force officials understood that Deese and Doe would have been allowed to continue to serve if they had been diagnosed with HIV as either: (i) an enlisted member who wanted to remain enlisted; or (ii) a commissioned officer.  But because they were both enrolled in the military academies—Deese as a midshipman at the USNA in Annapolis, Maryland and Doe as a cadet at USAFA in Colorado Springs, Colorado—when they received their HIV diagnoses, they were each denied a commission upon graduation and discharged from the military

3

altogether without even being afforded the discharge evaluation procedures required by DoD policies.

12.     The Navy's and Air Force's actions were not just contrary to military regulations relating to the treatment of active duty service members with HIV.  To the extent the Navy and Air Force followed outdated policies pertaining to HIV, their actions violate the Administrative Procedures Act and were unconstitutional.  Specifically, DoD, Navy, and Air Force policies and practices that single out and treat Deese and Doe—and others living with HIV—differently from other service members with manageable medical conditions having no effect on their ability to serve are arbitrary, capricious, contrary to law, an abuse of discretion, and a violation of Deese's and Doe's rights of equal protection.

13.     At best, Navy and Air Force policies singling out service members living with HIV for starkly different treatment are an unfortunate vestige of a time when HIV was untreatable and invariably fatal—an anachronism whose justifications no longer comport with modern medical science.  Whether these policies reflected animus at the time they originally were created, they now constitute outright discrimination.  When faced with other conditions or illnesses, each service member is given due consideration based on his or her circumstances and condition.  By contrast, when both Deese and Doe attempted to commission as officers while living with HIV, each faced an ill-informed, categorical bar banning him from continuing his service.

14.     The Navy, Air Force, and DoD have neglected their duty to treat their own service members with fairness and respect.  The purported justifications for discharging medically fit service members such as Deese and Doe are supported by neither the law nor the facts.  By establishing the illegality of Defendants' conduct and reinstating the commissions they were

denied based solely on their HIV status, this case seeks to correct that injustice and to prevent others from being subjected to the same mistreatment.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 2201–02.  This case poses federal questions that arise primarily from the U.S. Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; and other federal statutes, including 10 U.S.C. §§ 101, 1203, 1217, 5001, and 8075.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1).  A substantial part of the events and omissions giving rise to these claims occurred in this District. Additionally, one or more named Defendants include officers of the United States who reside in this District and who conduct a significant amount of their official duties in this District.

## THE PARTIES

### A.  Plaintiffs

17.     Plaintiff Deese is an honorably discharged veteran who served on active duty in the Navy as a midshipman at the USNA in Annapolis, Maryland and graduated in May 2014.

18.     Plaintiff Doe is an honorably discharged veteran who served on active duty in the Air Force—first as an enlisted service member and later as a cadet at the USAFA, graduating in June 2016.  Doe proceeds under a pseudonym not only for reasons of medical privacy but also because of the stigma, discrimination, and common misunderstandings associated with HIV.

### B.  Defendants

19.     Defendant James N. Mattis is the Secretary of the Department of Defense.  He leads the DoD and is responsible for the administration and enforcement of the challenged policies and practices.

5

20.     Defendant Richard V. Spencer is the Secretary of the U.S. Navy.  He is the leader of the Department of the Navy and responsible for its regulations and the actions taken against Deese.

21.     Defendant Walter E. Carter, Jr. is the Superintendent of the USNA, located in Annapolis, Maryland.  He oversees administration of USNA's functions, both academic and military training, and is responsible for the actions taken against Deese.

22.     Defendant Robert B. Chadwick is the Commandant of the USNA.  He is the second-in-command at the USNA and is in charge of the professional development and day-to-day activities of all midshipmen in the brigade, and is responsible for the actions taken against Deese.

23.     Defendant Heather A. Wilson is the Secretary of the U.S. Air Force.  She is the leader of the Department of the Air Force and responsible for its regulations and the actions taken against Doe.

24.     The Department of Defense is a department within the executive branch of the U.S. government responsible for coordinating and supervising all agencies and functions of the government concerned directly with the U.S. Armed Forces.  Under the direction of Secretary Mattis, DoD is also responsible for administration and enforcement of the challenged policies and regulations.

25.     All Defendants are sued in their official capacities and the counts below are alleged against the Defendants as enumerated therein.

**BACKGROUND**

**A.  Statutory and Regulatory Background**

26.     In addition to the Code of Federal Regulations ("C.F.R."), several other sets of regulations are relevant to active duty service members, including midshipmen and cadets, who

are diagnosed with HIV:  Department of Defense instructions ("DoDIs"), Naval instructions, and

Air Force instructions ("AFIs").[3]  Excerpts of these regulations, which, upon information and

belief, were in effect at the time of the events described herein, are appended to this Complaint:

- Exhibit A:  DoDI 6130.03, Medical Standards for Appointment, Enlistment, or Induction in the Military Services (April 28, 2010) (the "Medical Entry Standards DoDI")

- Exhibit B:  NAVMED P-117, Manual of the Medical Department, U.S. Navy (January 10, 2005) (the "Navy Medical Manual")

- Exhibit C:  DoDI 6485.01, Human Immunodeficiency Virus (HIV) in Military Service Members (June 7, 2013) (the "HIV DoDI")

- Exhibit D:  SECNAV Instruction 5300.30E, Management of Human Immunodeficiency Virus, Hepatitis B Virus and Hepatitis C Virus Infection in the Navy and Marine Corps (August 13, 2012) (the "HIV Naval Instruction")

- Exhibit E:  MILPERSMAN 1300-1300, Assignment of Personnel with Bloodborne Pathogens (BBP) (August 6, 2013) (the "BBP Naval Instruction")

- Exhibit F:  USNA Instruction 6130.1A, Processing of Midshipmen Medical Evaluation Boards (September 11, 2008) (the "USNA MEB Instruction")

- Exhibit G:  USNA Instruction 1301.5F, Midshipmen Service Assignment (July 28, 2014) (the "USNA Service Assignment Instruction")[4]

_____

[3] Current DoDIs and other DoD regulations and policies may be viewed at http://www.esd.whs.mil/DD/.  Current Naval Instructions and similar regulations or policies may be viewed at https://www.public.navy.mil/bupers-npc/reference/instructions/Pages/default.aspx. Current AFIs and similar regulations or policies may be viewed at http://www.e-publishing.af.mil/.

[4] Upon information and belief, the relevant portions of the USNA Service Assignment Instruction described herein were in effect at the time of the events described.

- Exhibit H:  SECNAV Instruction 1850.4E, Department of the Navy (DON) Disability Evaluation Manual (April 30, 2002) (the "Disability Standards Naval Instruction")

- Exhibit I:  AFI 48-123, Medical Examinations and Standards (November 5, 2013) (the "Medical Standards AFI")

- Exhibit J:  AFI 36-3504, Disenrollment of United States Air Force Academy Cadets (July 9, 2013) (the "Disenrollment AFI")

- Exhibit K:  AFI 44-178, Human Immunodeficiency Virus Program (March 4, 2014, certified current June 28, 2016) (the "HIV AFI")

**B.  Treatment of HIV**

27.    The landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified in the 1980s.

28.    In 1996, the advent of new antiretroviral medications to prevent the virus from replicating transformed the landscape of HIV treatment and prevention and radically shifted health outcomes for people living with HIV.

29.    The effectiveness of these antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood, which is referred to as the "viral load."  While a person in the acute or secondary stage of infection could have a viral load of one million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48-50, which is referred to as an "undetectable" viral load.

30.    With adherence to these medications, people living with HIV are restored to good health.  Patients with an AIDS diagnosis were literally brought back from the brink of death

8

through antiretroviral combination therapy.  Over time, researchers and clinicians were able to refine the use of these medications to make treatment adherence easier and health outcomes even better.  Though the side effects of the initial antiretroviral drugs were generally tolerable, researchers developed new medications that had few or no discernible side effects for most people.  The standard of care shifted to starting treatment with antiretroviral drugs almost immediately after diagnosis—a recognition that the benefits of treatment far outweighed any negative consequences of being on these medications.

31.    Today, though still incurable, HIV is a chronic, manageable condition rather than the terminal diagnosis it once was.  In fact, a 25-year-old diagnosed in a timely fashion and provided appropriate treatment has very near the same life expectancy as a 25-year-old who does not have HIV.

32.    Furthermore, medical researchers have now established that a person with a suppressed viral load is incapable of transmitting HIV.  Contrary to popular belief, even without viral suppression, HIV is not easily transmitted.  The Centers for Disease Control and Prevention ("CDC") estimates that, in the absence of treatment or other preventive measures, such as condom use, the risk of HIV transmission through a single act of receptive anal sex—the riskiest sexual activity—is approximately 1.38%.[5]  The per-act risk of transmission for other sexual activities is between zero and .08%.  However, *with adherence to HIV medications and the resulting viral suppression, the risk of transmission is essentially zero for any sexual activity*.[6]  Antiretroviral treatment therefore not only dramatically improves personal health

_____

[5] *See* Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risks/estimates/riskbehaviors.html (last updated Dec. 4, 2015).

[6] *See* Centers for Disease Control and Prevention, *Treatment as Prevention*, www.cdc.gov/hiv/risk/art/ (last updated May 7, 2018).

outcomes, but also improves public health outcomes by reducing transmission and the number of new cases.

33.     Transmission of HIV is extremely rare outside of the context of sexual activity, sharing of injection drug equipment, blood transfusion, needle sticks, or perinatal exposure (including breastfeeding).  For all other activities—including biting, spitting, and throwing of body fluids—the CDC characterizes the risk as "negligible" and further states that "HIV transmission through these exposure routes is technically possible but unlikely and not well documented."[7]  The theoretical possibility of HIV transmission in these other contexts is eliminated entirely by adherence to medications and the viral suppression that results.

34.     In sum, HIV is not the same disease it was once perceived to be.  But despite the tremendous breakthroughs in the treatment and prevention of HIV, people living with HIV continue to be subjected to stigma, ostracization, and discrimination rooted in misconceptions, fear, and ignorance that is deeply rooted in the psyche of some in our society.

**C. Deese's Discharge from the Navy**

35.     Deese dreamed of being a Navy officer ever since he visited the USNA when his older brother was a student in the early 2000s.  After dedicating himself to this goal during his teenage years, Deese secured a coveted spot at the USNA in 2010 at the age of 18.

36.     From July 1, 2010 to on or about May 25, 2014, Deese was a member of the Navy and on active duty while a midshipman at the USNA.  *See, e.g.*, 10 U.S.C. § 101(d)(1) ("The term 'active duty' . . . includes . . . attendance, while in the active military service, at a school

---

[7] Centers for Disease Control and Prevention, *HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act*, www.cdc.gov/hiv/risks/estimates/riskbehaviors.html (last updated Dec. 4, 2015).

designated as a service school by law or by the Secretary of the military department concerned.").

37.     Deese received high grades and performance reviews during his studies at the USNA, including the National Defense Service Medal, Navy Rifleman Marksmanship Medal, and Navy Pistol Marksmanship Medal (Expert).

38.     Deese frequently sought out additional responsibilities and challenges.  He served as the Third Company's Training Officer and Platoon Commander in 2014.  According to his superior officers, he was instrumental in the Third Company's significant academic improvement by supporting the Company Commander's vision during the 2014 academic year.

39.     Deese passed all medical examinations while he was at the USNA, including the final one required for commissioning.

40.     As he neared graduation, Deese applied early for the Navy's selective nuclear submarine program with the goal of attending Nuclear Power School after he became a Navy officer.  The nuclear submarine program is one of the Navy's most elite, requiring excellence in mathematics, physics, calculus, and special exercises at the Navy Yard.[8]  Deese also passed the required interview with the four-star admiral in charge of nuclear reactors.

41.     Weeks before he was scheduled to graduate in May 2014, Deese also decided to apply for an optional and selective dive program, which required additional medical screening that was not required for other USNA officer candidates.

---

[8] "The Officers who man these $1.5 billion [nuclear submarine] vessels are held to the highest of standards and have extraordinary roles and responsibilities.  Only a select group of disciplined and committed Officers are given the opportunity to lead departments up to an entire crew, commanding some of the most technologically advanced equipment in the world."  *U.S. Navy, Nuclear Submarine Officer Careers*, https://www.navy.com/careers/nuclear-submarine-officer.

42.      On April 1, 2014, Captain Bill Byrne, then the Commandant of the USNA, called Deese to his office.  Captain Byrne informed Deese that these additional medical tests revealed that Deese was HIV positive.  Captain Byrne told Deese that based on this diagnosis, Deese would not be commissioned as an officer in the Navy upon graduation.  Captain Byrne did not cite any specific military or naval regulations or provisions as the basis for this decision.  He also did not provide any options for Deese to be evaluated by a medical or review board.  In fact, he incorrectly informed Deese that he would not be able to obtain a waiver permitting him to commission despite his HIV diagnosis.

43.      Reeling from the diagnosis and devastated by the news that he would not be able to serve as a Naval officer, Deese did not immediately investigate or challenge the Commandant's characterization of Deese's options.  He was also afraid that inquiring about a waiver or medical review processes would risk making his HIV status public.

44.      On information and belief, certain USNA officials, including Commandant Byrne, were led to believe by Navy officials that Deese would not be commissioned pursuant to the HIV Naval Instruction (Ex. D).  As a result, USNA officials did not begin the process of requesting an exception to policy ("ETP") to the HIV DoDI (Ex. C) (which was implemented by the HIV Naval Instruction) from the issuing authority for that instruction, the Undersecretary of Defense for Personnel and Readiness ("USD/P&R").  (Ex. C, HIV DoDI, Encl. 2 ¶ 1, at p. 5.)  Nor was a Medical Evaluation Board ("MEB") or Physical Evaluation Board ("PEB") convened to assess Deese's medical qualification for continued service, in accordance with the USNA MEB and Commissioning Decision Instruction (Ex. F).  (Ex. F, USNA 6130.1A, ¶¶ 1, 4, at pp. 1-2.)

45.      Meanwhile, Deese participated in the same induction and commitment ceremonies as all of the other midshipmen in his class and received the same diploma.  In late

12

May 2014, Deese attended the same graduation and commissioning ceremonies as his classmates.

46.     On his graduation day, Deese's family, including, his parents, in-laws, and older brother—a Naval officer that Deese revered—had come to Annapolis for the graduation.  Still traumatized from his diagnosis and the news that he could not commission, Deese told the many people who asked that he was medically disqualified from commissioning, obfuscating the details because he was experiencing shame and rejection from the military as a result of his diagnosis and was afraid of other adverse consequences should more people discover he was living with HIV.

47.     Deese was fully qualified at the time of graduation to commission into the Navy as an officer and to serve as an officer on a surface (non-submarine) ship, without any additional training.  Yet, because of his HIV diagnosis, Deese was denied that opportunity and held in limbo as an active duty midshipman but not allowed to commission or serve.  As a result of the Navy's arbitrary decision not to commission Deese, he was subject to significant humiliating scrutiny into his private life and sensitive medical information by his classmates, fellow midshipmen, family, friends, and acquaintances.

48.     As Deese learned more about HIV, how to manage his condition, and how to advocate for himself as a person living with HIV, he began to question Captain Byrne's characterization of his options and the viability of a path to commissioning at the time of his diagnosis.  As he learned more about the Navy's regulations pertaining to HIV, Deese began contacting various personnel at the USNA in the hopes of obtaining a waiver to commission.

49.     Unfortunately, Deese was met with numerous impediments along the way, with some even criticizing Deese's "persistence" in his self-advocacy.  In an effort to facilitate the

process, Deese also contacted those in his chain of command for their opinions and recommendations regarding his potential commissioning.

50.     On September 5, 2016, Deese received a recommendation for a medical waiver for HIV to commission into the Navy from Brandy N. Stewart, Eleventh Company Senior Enlisted Leader, then the Third Company Senior Enlisted Leader at the USNA.  Stewart also remarked on Deese's exemplary service and leadership.

51.     On September 19, 2016, Dr. Jason M. Blaylock, Deese's infectious disease physician at Walter Reed National Military Medical Center (until he began civilian care on May 31, 2015), wrote a letter finding Deese fit for duty and stating that his diagnosis would not impair his service in the Navy.  Specifically, Dr. Blaylock noted that Deese "demonstrated excellent compliance with his medical care.  He has demonstrated a consistently undetectable HIV viral load and a stable CD4 count well above 500, indicative of robust immune reconstitution.  To date, he has suffered no complications of HIV infection, and his infection is very well controlled on a one-pill once daily regimen.  With continued adherence to this regimen and biannual medical follow up evaluations, he remains fit for duty and I do not anticipate any concerns that would restrict his future abilities to serve in the US Navy."

52.     On October 16, 2016, Deese received a recommendation for medical waiver for HIV from LCDR Patrick C. Cashin, Engineer Officer, USS Maine, then the Third Company Officer at the USNA, to commission into the Navy.  LCDR Cashin also remarked on Deese's exemplary service and leadership.

53.     On October 27, 2016, Deese sent his formal request for a waiver to commission into the Navy to the Secretary of the Navy via Vice Admiral Walter E. Carter Jr., Superintendent of USNA.  Deese stated, "I would have pushed much harder on my own behalf to commission

had it not been presented to me two years ago as black-and-white that my commissioning would

not be a possibility.  Receiving a diagnosis that is laden with stigma (a stigma made heavier by

policies such as these)—in the same breath as the news that I would not commission and that

there was nothing I could do to change that fact—left me in no state of mind to begin a fight that

would only prolong the supposed inevitable."

      54.    Deese also noted that Naval Regulations are internally inconsistent:

> The section of [SECNAVINST 5300.30E] regarding USNA midshipmen, who are
> active-duty members of the military but also must meet commissioning
> requirements upon graduation, was evidently included arbitrarily as a way to
> reconcile the difference in the Navy's retention and accession policies in regard to
> this condition. Had I received this diagnosis a mere two months later, based on the
> overall retention policy set out in the instruction, I would still be serving as a naval
> officer ~able to be deployed on a carrier, or serving in a restricted-line community
> such as Intelligence Warfare, where I could leverage my Chinese degree, or Public
> Affairs, where I feel I can make an immediate positive contribution . . . my utmost
> desire is to fulfill the commitment I made to support and defend the Constitution
> the United States as a naval officer.

Indeed, the BBP Naval Instruction (Ex. E) confirms that "Military personnel who demonstrate no

evidence of unfitting medical conditions associated with human immunodeficiency virus (HIV)

infection shall be retained in the service, unless some other reason for separation exists."  (Ex. E,

MILPERSMAN 1300-1300, ¶ (1)(a).)

      55.    On November 8, 2016, Superintendent Carter sent a letter to the Secretary of the

Navy acknowledging Deese's fitness for duty and endorsing his pursuit to commission into the

U.S. Navy.  Specifically, Superintendent Carter stated:

> As a graduated midshipman, Midshipman Deese already completed four years of
> rigorous military training and represents a large investment on the part of the Navy.
> He is in good health and capable of performing his duties.  If Midshipman Deese
> were diagnosed days after commissioning, he would be retained and DON policy
> would allow him to serve overseas and on large deck ships.  Given the reasons
> behind retaining Service members versus the reason for separating new recruits
> who are HIV positive, Midshipman Deese, as a graduated Naval Academy
> midshipman, is more similar to an active duty service member who would be
> retained upon a diagnosis of HIV.  An exception to policy in this case would achieve

15

the DoD objective of retaining service members after they have been extensively trained, so long as they are capable of performing their duties.

Superintendent Carter therefore "recommend[ed] approval of an exception to policy for Midshipman Kevin Deese to commission with a Human Immunodeficiency Virus (HIV) positive status."  Upon information and belief, consistent with his authority under the USNA MEB Instruction (Ex. F) and the USNA Midshipmen Service Assignment instruction (Ex. G), Superintendent Carter recommended that Deese be allowed to waiver to commission.

56.     In May 2017, Deese received his DD-214 discharge papers.  He had not received any response to his request for a medical waiver or an exception to policy that would allow him to commission.

57.     The stated basis for Deese's honorable discharge was that he was not medically fit for duty.  This conclusion was inconsistent with the opinions of his doctors and his commanders. Moreover, a discharge based on medical unfitness for continued naval service must be processed through the disability evaluation system ("DES"), which may include an assessment by a MEB and PEB.  (Ex. B, Navy Medical Manual Art. 18-1, 18-11; Ex. H, SECNAV Instruction 1850.4E, ¶ 1003, at p. 1-5.)  When Deese was discharged, he did not undergo any such processing or evaluation by a MEB or PEB, despite acquiring HIV while on active duty.

58.     The relevant regulations were applied to Deese in an arbitrary fashion.  But for his decision to pursue enrollment in an elite Navy dive program, Deese would have graduated and commissioned as an officer the following month.  After commissioning, he would have been subject to different regulations designed to retain him rather than to separate him from the Navy.

59.     Furthermore, had the regulations pertaining to medical waivers and exceptions to policy not been applied in an arbitrary manner, upon information and belief, Deese would have been granted a waiver or exception to policy and allowed to commission.

60.     Specifically, Title 32, part 66 of the Code of Federal Regulations and the Medical Entry Standards DoDI (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3, at p. 7) granted medical waiver authority to the service secretary.  Upon information and belief, the Secretary of the Navy, pursuant to the USNA MEB Instruction (Ex. F) and the USNA Midshipmen Service Assignment Instruction (Ex. G), delegated that final authority to the Superintendent of the USNA for USNA midshipmen.

61.     If assessed under the USNA MEB Instruction (Ex. F, USNA 6130.1A, ¶¶ 4-5, at pp. 1-2), Deese met the standards for continued service and commissioning.  Through an appropriate exercise of discretion, he should have and upon information and belief, would have, been granted a waiver of commissioning standards by the Superintendent.  (Ex. G, USNA 1301.5F, ¶ 5(a)(1)(a).)

62.     To date, Deese remains medically fit for service and could serve in a litany of roles within the Navy, ranging from surface ships to intelligence warfare to submarine service.

63.     Indeed, discharging Deese and preventing him from service is an incredible waste of taxpayer dollars after the Navy's investment in his education and training, including tuition, room, board, uniforms, Lasik eye surgery, and pay and bonus, which in total has been in excess of $400,000.

64.     Regulations preventing people living with HIV from enlisting, deploying and commissioning serve no legitimate governmental interest, but instead have the effect of separating medically fit, committed individuals from a dedicated future in the Armed Services.

**D.  Doe's Discharge from the Air Force**

65.     On January 13, 2009, Doe enlisted in the Air Force for a term of six years.  He subsequently earned the position of Space System Operations Journeyman.

66.     On July 13, 2011, Doe was promoted to the grade of E-4, Senior Airman, the grade he retained until his honorable discharge.

67.     From June 28, 2012, to January 12, 2015, Doe was a member of the Air Force in enlisted status and on active duty while a cadet at the USAFA.  (*See* 10 U.S.C. § 516.)  U.S. service academy cadets are service members on active duty.  *See, e.g.*, 10 U.S.C. § 101(d)(1) ("The term 'active duty' . . . includes . . . attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned.").

68.     On February 28, 2014, while at the USAFA, Doe was diagnosed with HIV after a routine physical examination.  A military medical evaluation board ("MEB") was subsequently convened to assess Doe's medical qualification for continued service, in accordance with the Disenrollment AFI (Ex. J).

69.     On June 2, 2014, the MEB issued a Return to Duty determination, allowing then-cadet Doe to continue to serve in the military.

70.     On June 9, 2014, Doe's immediate commanding officer held a meeting with other USAFA staff members to determine the "way ahead" for Doe, presenting a PowerPoint deck entitled the "way ahead" and noting divergent standards for *accession* of individuals living with HIV into the military and *retention* of individuals living with HIV already in the military. Accession standards precluded individuals living with HIV from appointment, enlistment, or induction into the military, whereas retention standards permitted enlisted and commissioned officers diagnosed with HIV on active duty to remain if found medically fit.  (*See* Medical Entry Standards DoDI, Ex. A ¶ 4(a)–(c), at p. 2, Encl. 4 ¶ 1, at p. 10, Encl. 4 ¶ 24(b), at p. 38; HIV DoDI, Ex. C Encl. 3 ¶ 2(c), at p. 7; HIV AFI, Ex. K, Attach. 9 ¶ A9.1, at p. 36.)

18

71.     USAFA staff officers were confused about the applicable standard because, as stated in the PowerPoint, "there was no verbiage specific to prior-enlisted cadets," which Doe was.

72.     On November 3, 2015, Doe received a medical waiver for HIV from Lt. Gen. Michelle D. Johnson, the superintendent of the USAFA, to continue his service at the USAFA.

73.     In or around August 2014, during the beginning of his third year at the USAFA, Doe was offered and took a "commitment oath," vowing to serve for two additional years at USAFA and five thereafter as an officer.  USAFA officials told Doe that he was eligible to take the oath, and they did not inform him of any possibility that he might not be allowed to commission.

74.     Doe participated in the same commitment ceremony as all of the other cadets in his class.  He also received the same commitment packet, including a letter from the Commander-in-Chief.

75.     On January 13, 2015, Doe completed his term of enlistment.  Having received a medical waiver and been found medically fit for duty, Doe did not re-enlist, because he was led to believe by officials in the Air Force that he would be able to commission upon graduation from the USAFA.

76.     On July 28, 2015, Doe received his second of three return-to-duty authorizations, indicating that he was medically fit to serve.

77.     During the fall semester of 2015, certain USAFA officials were led to believe by Air Force officials that Doe would have to be disenrolled in accordance with the HIV AFI (Ex. K).  Believing Doe should be permitted to commission, because Doe was (and is) medically fit to perform all of his duties as an officer, USAFA officials began the process of requesting an

19

exception to policy ("ETP") to the HIV DoDI (Ex. C) (which was implemented by the HIV AFI) from the author of that instruction, the Undersecretary of Defense for Personnel and Readiness ("USD/P&R").

78.     On September 9, 2015, the director of the Air Force's Medical Evaluation Unit at San Antonio Military Medical Center ("SAMMC") wrote a letter recommending that, in his professional medical opinion, Doe was fit for duty and should be commissioned.

79.     On October 1, 2015, the staff Judge Advocate of the USAFA wrote an email expressing doubt that the ETP path was the proper procedure, and instead expressed support for a medical waiver by the USAFA chief medical officer (the "Surgeon General") or delegated authority.

80.     In an October 5, 2015 email to the USAFA staff Judge Advocate, the Surgeon General stated that he would grant Doe a medical waiver for HIV.

81.     When an ETP application was submitted instead, the Surgeon General maintained his support for Doe to commission in another October 5, 2015 email.

82.     Every single officer in Doe's chain of command, from Major to three-star General, including all medical officers responsible for Doe's evaluation and treatment, recommended that Doe be retained and commissioned.

83.     In December 2015, a staff summary sheet ("SSS") ETP complete with endorsements, letters, and recommendations was prepared for routing to the USD/P&R as the sole authority to grant an ETP.  Every senior officer at the USAFA, including the commanding three-star Superintendent, endorsed the ETP package.  Doe viewed the package before submission.

20

84.     On April 12, 2016, the Department of the Air Force issued orders assigning Doe to be a Second Lieutenant and contracting officer at Joint Base Andrews in Maryland, reporting no later than August 6, 2016.

85.     Doe graduated from the USAFA on June 2, 2016, with a Bachelor of Science degree.

86.     Doe received a certificate of commissioning, a DoD Form 1AF, signed by the Secretary of the Air Force, stating he had been commissioned as a Second Lieutenant in the Regular component of the United States Air Force on June 2, 2016.

87.     On or about June 2, 2016, Doe took the same oath of office, required by federal statute, that other cadets took to become officers.

88.     On information and belief, Doe was included on a list of persons appointed to the rank of Second Lieutenant, signed by the Secretary of Defense.

89.     Notwithstanding other subsequent Air Force administrative requirements that are not prerequisites to holding office, on information and belief, Doe commissioned in the U.S. Air Force as a Second Lieutenant on June 2, 2016.

90.     After graduation, however, the Air Force did not recognize Doe as a commissioned Second Lieutenant and held him in cadet status while the ETP was being processed.

91.     Doe made numerous inquiries to his commanding officer as to his status and the progress of the ETP.  He was not provided with any information responsive to those inquiries.

92.     On or about July 22, 2016, Doe was informed through his commanding officer that the ETP package was subject to a delay "caused by a rewrite to the request per staff."  Doe was not informed as to the substance of the rewrite, which sections of the ETP were altered, or

whether it was rerouted.  The commanding officer informed Doe "it was all done by the Air Staff liaison at the Pentagon."

93.     On September 14, 2016, while waiting for a determination on the ETP, Doe received his third return-to-duty waiver from military physicians deeming him medically fit to serve.

94.     On or about September 21, 2016, Doe met with the USAFA Commander's director of staff, who notified Doe that the Air Force Chief of Staff and Vice Chief of Staff were reviewing the ETP package and would discuss it during an upcoming leadership conference.

95.     Neither the Air Force Chief of Staff nor the Vice Chief of Staff were on the original routing sheet for the ETP, nor did they hold any medical expertise or general waiver authority according to applicable regulations.

96.     On October 5, 2016, a colonel at USAFA informally notified Doe that the Chief of Staff of the Air Force was recommending that he not be commissioned as an officer.

97.     Doe was not informed of the basis or any justification for the Air Force Chief of Staff's action, nor under what authority he was acting.

98.     Upon information and belief, the ETP package had been re-routed to either the Chief of Staff of the Air Force or the Secretary of the Air Force, rather than properly sent to the USD/P&R for approval or denial.

99.     On October 13, 2016, Doe was informed by the USAFA's staff Judge Advocate and other officers from the USAFA that the Secretary of the Air Force denied the ETP request.

100.     On October 26, 2016, Deputy Assistant Secretary of the Air Force for Force Management Integration, Jeffrey R. Mayo, wrote a letter to the USAFA commander stating that

22

the Secretary of the Air Force disapproved of Doe's ETP request on September 28, 2016, and approved of taking action to separate and discharge him.

101.    On November 1, 2016, Doe was summarily discharged from the Air Force.

102.    Doe's Certificate of Discharge ("DD-214") characterizes the discharge as honorable and offers "Secretarial Authority" as the narrative reason for separation.  AFI 36-3504 (Ex. J, the Disenrollment AFI) is listed as the authority for Doe's separation on his DD-214.

103.    If properly assessed under the Disenrollment AFI, Doe would have met the standards for continued service and commissioning by virtue of either a return-to-duty determination or the granting of a waiver by the chief medical officer of USAFA, Col. Walter Matthews, as directed by that regulation and the Medical Standards AFI (Ex. I).

104.    Doe's DD-214 also originally listed him as a commissioned Second Lieutenant. An administrative correction subsequently was issued to amend his rank to "AF Cadet."

105.    Doe's DD-214 now indicates that he did not become an officer and was removed from the USAFA shortly after graduation.  The only two logical conclusions to be drawn from Doe's DD-214 are either that the Air Force found Doe unfit to serve or that some other unusual circumstance or problem required his separation from service.

106.    The basis for Doe's discharge was that he was not medically fit for duty. However, a discharge based on medical unfitness must be processed through the disability evaluation system ("DES").  (Ex. I, Medical Standards AFI ¶ 5.2, at p. 24.)  When Doe was discharged, he did not undergo any such processing, despite acquiring HIV while on active duty.

*** 

107.    Despite seemingly complex regulations, this case is simple: Military medical professionals, who have the requisite knowledge, expertise, and judgment, should determine

whether a person is medically fit to serve.  And no predetermined biases or stigma-based categorical bans should interfere.  The Constitution, military regulations, and equitable principles demand nothing less.

108.    In Deese's case, he would have graduated and commissioned as an officer prior to diagnosis had he not volunteered for additional diving training.  After commissioning, he would have been subject to the retention standards of the Navy, which permit and favor retention of medically fit personnel living with HIV.  There is no legitimate governmental interest that justifies handling Deese differently based on whether his diagnosis occurred one month before versus one month after his graduation from the Naval Academy.  Moreover, according to DoD and Navy regulations, Deese should have been: (a) granted a medical waiver and retained as an officer; or (b) retained after being processed through the DES and returned to duty as an officer (and categorized in the "retention" standard for all applicable regulations); and/or (c) retained because the person with the authority to grant him a waiver—Superintendent Carter—indicated he would grant a waiver and advocated that Deese be commissioned as an officer.

109.    In Doe's case, he passed medical evaluations and was found fit for duty three separate times after his HIV diagnosis.  According to DoD and Air Force regulations, Doe should have been and/or was: (a) granted a medical waiver and retained as an officer; or (b) retained after being processed through the DES and returned to duty as an officer (and categorized in the "retention" standard for all applicable regulations); and/or (c) retained because the person with the authority to grant him a waiver—Col. Matthews, the USAFA Surgeon General—indicated he would grant a waiver and advocated that Doe be commissioned as an officer.

24

110.     Even if Navy, Air Force, and DoD officials had followed proper procedures and had not acted in an arbitrary or capricious manner in denying Deese and Doe their commission, the regulations to which Deese and Doe were subjected are otherwise contrary to law and a violation of equal protection.  As such, they should be invalidated.  Under retention standards (including those already issued in the HIV DoDI) setting criteria for HIV similar to those for other chronic, manageable conditions, Deese and Doe would be commissioned as officers.

### CLAIMS FOR RELIEF

### COUNT  I

**Violation of the Administrative Procedure Act (APA)**
**as to Deese's Discharge Against Defendants Mattis, DoD, Spencer, Carter, and Chadwick**

111.     All prior paragraphs are incorporated as if fully set forth herein.

112.     The Navy has failed to abide by its own regulations and governing statutes in the process of summarily discharging Deese.

113.     If the procedures set forth in the applicable regulations described above had been followed, Deese would have been retained and commissioned.

114.     Title 32, part 66 of the Code of Federal Regulations and the Medical Entry Standards DoDI (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3, at p. 7) granted medical waiver authority to the service secretary.

115.     As set forth above, upon information and belief, the Secretary of the Navy, pursuant to the USNA MEB Instruction (Ex. F), delegated that final authority to the Superintendent of the USNA for USNA midshipmen.  Upon reviewing the relevant materials, Superintendent Carter recommended that Deese be granted a waiver to commission.  Plaintiff Deese should have been retained and commissioned under these regulations, consistent with his treating physician's and the Superintendent's recommendations.

116.    If the retention standards for active duty members had been applied to Deese, he would have been retained in the military, according to either the Medical Entry Standards DoDI (Ex. A), the HIV DoDI (Ex. C), the HIV Naval Instruction (Ex. D), and/or the USNA MEB Instruction (Ex. F).

117.    If the accession standards had been applied to Plaintiff Deese, upon information and belief, he would have been retained and allowed to serve as an officer, because he would have been found fit for duty and granted a waiver to commission by the Superintendent.

118.    Pursuant to the Navy Medical Manual and Disability Standards Naval Instruction, a midshipman found medically unfit for duty must go through DES processing in accordance with federal statute and regulations.  (Ex. B, Navy Medical Manual Art. 18-1, 18-11; Ex. H, SECNAV Instruction 1850.4E.)  The Navy denied Deese the proper DES process.

119.    Through the actions and omissions above, Defendants Mattis, DoD, Spencer, Carter, and Chadwick violated the APA.

## COUNT  II

### Violation of the Administrative Procedure Act (APA) as to Doe's Discharge Against Defendants Mattis, DoD, and Wilson

120.    All prior paragraphs are incorporated as if fully set forth herein.

121.    The Air Force failed to abide by its own regulations and governing statutes in the process of summarily discharging Doe.

122.    If the procedures set forth in the regulation cited as the separation authority for Doe, AFI 36-3504 (Ex. J) had been followed, Doe would have been retained.

123.    Title 32, part 66 of the Code of Federal Regulations and the Medical Entry Standards DoDI (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3, at p. 7) granted medical waiver authority to the service secretary.  The Secretary of the Air Force, by the Medical Standards AFI, delegated

26

that authority to the chief medical officer of the USAFA (Ex. I, AFI 48-123, Attach. 2, at p. 78), who stated he would grant a waiver to Doe to continue at the USAFA and to serve as an officer. The service secretary provided no explanation or rationale for why the decision of the chief medical officer of the USAFA was overruled.  Plaintiff Doe should have been retained and commissioned under these regulations.

124.    If the retention standards for active duty members had been applied to Doe, he would have been retained in the military, according to either the Medical Entry Standards DoDI (Ex. A), the HIV DoDI (Ex. C), or the HIV AFI (Ex. K).

125.    If the accession standards had been applied to Doe, he would have been retained and allowed to serve as an officer, because he was granted a waiver by the Surgeon General and/or as part of an MEB process and was found fit for duty.

126.    Doe's completed ETP was not properly routed to the USD/P&R as the sole authority to grant an ETP pursuant to the relevant regulations, but rather was improperly intercepted by the Air Force Chief of Staff, leading to his discharge.

127.    Pursuant to the Medical Standards AFI, a cadet found medically unfit for duty must go through DES processing in accordance with federal statute and regulations.  (Ex. I, AFI 48-123 ¶ 5.2.1.1, at p. 24.)  In accordance with the Disenrollment AFI, the only path to discharge a cadet with medical issues is to conduct a DES, which consists of an MEB process and, if found unfit there, a referral to a PEB to determine final fitness, disability, or separation.  (Ex. J, AFI 36-3504 ¶ 8, at p. 5)  The Air Force denied Doe the proper DES process.

128.    Through the actions and omissions above, Defendants Mattis, DoD, and Wilson violated the APA.

## COUNT  III

### Violation of the Administrative Procedure Act (APA) as to
### SECNAVINST 5300.30E Against Defendants Mattis, DoD, Spencer, Carter, and Chadwick

129.    All prior paragraphs are incorporated as if fully set forth herein.

130.    Plaintiff Deese has no adequate or available administrative remedy; in the
alternative, any effort to obtain an administrative remedy would be futile.

131.    The parts of the HIV Naval Instruction (Ex. D) that direct USNA midshipmen and
officer candidates to be summarily disenrolled, discharged, and/or not afforded a DES process
are proscribed by the APA and should be declared unlawful because they are arbitrary,
capricious, not in accordance with law, and an abuse of discretion.

132.    The parts of the HIV Naval Instruction that categorically bar USNA midshipmen
and officer candidates with HIV from being commissioned as officers are arbitrary, capricious,
not in accordance with law, and an abuse of discretion.

133.    The HIV Naval Instruction is based on outdated thinking that does not comport
with the current state of HIV medical science.

134.    The parts of the HIV Naval Instruction that categorically bar USNA midshipmen
and officer candidates with HIV from participating in a commissioning program or from being
commissioned as officers conflict with several federal statutes and with other DoD and Naval
regulations, including:

(a)    Section 9 of the HIV Naval Instruction (Management of Human
Immunodeficiency Virus) and Attachment 9 of AFI 44-178 (Human Immunodeficiency
Virus Program), which direct retention for active duty service members living with HIV
(Ex. D, SECNAVINST 5300.30E, at p. 10; Ex. K, AFI 44-178, Attach. 9 ¶ A9.1 at p. 36);

28

(b)      38 U.S.C. §§ 101(2); *id.* § 101(21)(D); 10 U.S.C. § 101(d)(1), 10 U.S.C. § 8075, and cases such as *Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017), and *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017), which hold that academy midshipmen are active duty service members;

(c)      DoDI 6485.01 (Human Immunodeficiency Virus (HIV) in Military Service Members), which states that active duty members are to be retained if they clear medical evaluations (Ex. C, DoDI 6485.01, Encl. 3 ¶ 2(c), at p. 7);

(d)      10 U.S.C. ch. 61 (Retirement or Separation for Physical Disability), which states that medical separation and DES processing applies to service academy midshipmen and outlines the process for medical separations;

(e)      DoDI 1332.18 (Physical Disability Evaluation), which is the DoD regulation referenced in DoDI 6485.01 and necessarily contemplates waiver, and which implements chapter 61 of title 10 for the Department of Defense;

(f)      SECNAVINST 1850.4E (Disability Evaluation Manual), which implements the DES process from federal statute and the parent DoDI 1332.18;

(g)      32 C.F.R. pt. 66 (Qualification Standards for Enlistment, Appointment, and Induction), which states that the service secretary is the waiver authority for a medical standard;

(h)      DoDI 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), which states that the service secretary is the waiver authority for a medical standard (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3(b), at p. 7); and

(i)      USNAINST 6130.1B (Processing Midshipmen Medical Evaluation Boards and Commissioning Decisions), which delegates waiver authority from the

Secretary of the Navy to the USNA Superintendent, and states that if a midshipman receives a waiver from the accession medical standards, the retention medical standards apply (USNAINST 6130.1B, at p. 4).  *See also* Ex. G, USNA 1501.5F at p. 2.

135.     For the reasons above, certain parts of the HIV Naval Instruction are arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to the APA.

136.     Through the actions and omissions above, Defendants Mattis, DoD, Spencer, Carter, and Chadwick violated the APA.

## COUNT  IV

### Violation of the Administrative Procedure Act (APA)
### as to AFI 44-178 Against Defendants Mattis, DoD, and Wilson

137.     All prior paragraphs are incorporated as if fully set forth herein.

138.     Plaintiff Doe has no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

139.     The parts of the HIV AFI (Ex. K) that direct active duty cadets and officer candidates to be summarily disenrolled, discharged, and/or not afforded a DES process are proscribed by the APA and should be declared unlawful because they are arbitrary, capricious, not in accordance with law, and an abuse of discretion.

140.     The parts of the HIV AFI that categorically bar USAFA cadets or other officer candidates with HIV from being commissioned as officers are arbitrary, capricious, not in accordance with law, and an abuse of discretion.

141.     The HIV AFI is based on outdated thinking that does not comport with the current state of HIV medical science.

142.     The parts of the HIV AFI that categorically bar USAFA cadets or other officer candidates with HIV from participating in a commissioning program or from being

commissioned as officers conflict with several federal statutes and with other DoD and Air Force regulations, including:

   (a)   Attachment 9 of AFI 44-178 (Human Immunodeficiency Virus Program), which directs retention for active duty service members living with HIV (Ex. K, AFI 44-178, Attach. 9 ¶ A9.1 at p. 36);

   (b)   38 U.S.C. §§ 101(2); *id.* § 101(21)(D); 10 U.S.C. § 101(d)(1), 10 U.S.C. § 8075, and cases such as *Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017), and *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017), which hold that academy midshipmen and academy cadets are active duty service members;

   (c)   DoDI 6485.01 (Human Immunodeficiency Virus (HIV) in Military Service Members), which states that active duty members are to be retained if they clear medical evaluations (Ex. C, DoDI 6485.01, Encl. 3 ¶ 2(c), at p. 7);

   (d)   10 U.S.C. ch. 61 (Retirement or Separation for Physical Disability), which states that medical separation and DES processing applies to service academy midshipmen and cadets and outlines the process for medical separations;

   (e)   DoDI 1332.18 (Physical Disability Evaluation), which is the DoD regulation referenced in DoDI 6485.01 and necessarily contemplates waiver, and which implements chapter 61 of title 10 for the Department of Defense;

   (f)   AFI 36-3212 (Physical Evaluation for Retention, Retirement, and Separation), which implements the DES process from federal statute and the parent DoDI 1332.18;

31

(g)      32 C.F.R. pt. 66 (Qualification Standards for Enlistment, Appointment, and Induction), which states that the service secretary is the waiver authority for a medical standard;

(h)      DoDI 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), which states that the service secretary is the waiver authority for a medical standard (Ex. A, DoDI 6130.03, Encl. 2 ¶ 3(b), at p. 7);

(i)      AFI 48-123 (Medical Examinations and Standards), which delegates waiver authority from the Secretary of the Air Force to the USAFA chief medical officer (USAFA/SG), and states that if a cadet receives a waiver from the accession medical standards, the retention medical standards apply (Ex. I, AFI 48-123, Attach. 2, Table A.2.1, at pp. 77–78; Ex. I, AFI 48-123 ¶ 5.2.1.1, at p. 24); and

(j)      AFI 36-3504 (Disenrollment of United States Air Force Academy Cadets), which states that AFI 48-123 controls the fitness for duty or medical discharge of USAFA cadets (Ex. J, AFI 36-3504 ¶ 8, at p. 5).

143.      For the reasons above, certain parts of the HIV AFI are arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to the APA.

144.      Through the actions and omissions above, Defendants Mattis, DoD, and Wilson violated the APA.

## COUNT  V

### Violation of the Administrative Procedure Act (APA)
### as to DoDI 6485.01 against all Defendants

145.      All prior paragraphs are incorporated as if fully set forth herein.

146.      Plaintiffs Deese and Doe have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

147.     Applying the HIV DoDI (Ex. C) to bar service academy cadets or other officer candidates with HIV from participating in a commissioning program or from being commissioned as officers is arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to the APA.

148.     Applying the HIV DoDI to prevent the secretary of each armed service or their designees to determine waiverability of the medical standards the secretary has set for fitness to serve is contrary to regulation and statute, and otherwise arbitrary and capricious and an abuse of discretion, all contrary to the APA.

149.     The original publication of the DoD regulation prohibiting people with HIV from joining the services in any capacity, and prohibiting service members with HIV from becoming officers, did not establish that the DoD had examined the relevant data and did not articulate a rational connection between the facts and the policy choices made.  As such, that DoDI and any subsequent continuation of those prohibitions in the Code of Federal Regulations, in DoD directives, instructions, or other regulations, or in service-specific directives, instructions, or regulations, is arbitrary, capricious, not in accordance of law, an abuse of discretion, and violative of the APA.

150.     The HIV DoDI was required to have been both published in the Federal Register and put through notice and comment.  It was not.  Accordingly, the Court should vacate the regulation based on the procedural violation.

151.     Additionally, or alternatively, because the HIV DoDI was a substantive or legislative rule, this Court should vacate it as unlawful based on either a procedural violation of the APA or a procedural violation of the DoD's own regulations.

33

152.     If the DoDI is considered interpretative, the policy on excluding service members or civilians with HIV from becoming officers is arbitrary and capricious, not in accordance with law, and contrary to the APA.

153.     Through the actions and omissions above, Defendants violated the APA.

## COUNT  VI

### Violation of Procedural Due Process Under the Fifth Amendment
### as to Deese's Discharge Against Defendants Mattis, DoD, Spencer, Carter, and Chadwick

154.     All prior paragraphs are incorporated as if fully set forth herein.

155.     In May 2017, Plaintiff Deese was discharged purportedly because he was medically unfit for duty due to a medical condition (HIV) he acquired while on active duty. While Plaintiff Deese does not agree that he was medically unfit—and his infectious disease physician at Walter Reed, Dr. Blaylock, indeed found him medically fit—the Navy's discharge entitled Deese to a DES process in accordance with Navy and DoD regulations and chapter 61 of title 10 of the U.S. Code.  Plaintiff Deese has a property right in the benefits to which he is entitled as a service member who acquired, while on active duty, a condition the military deemed disabling.

156.     The actions taken by the Navy and DoD placed a stigma or purported disability on Deese that led to a change in Deese's status and foreclosed his freedom to take advantage of employment opportunities and by broadly precluding him from continuing in his chosen career. Moreover, Defendants' actions are more likely to result in the forced disclosure of Deese's HIV status in order to explain the discharge on his record.  As a result, Defendants Mattis, DoD, Spencer, Carter, and Chadwick deprived Plaintiff Doe of a liberty interest.

157.    Deese was not afforded the process due, such as processing through the DES.  He was not given the opportunity to dispute to the proper authority through evidence, testimony, and a hearing that he was—and is—medically fit for service and fit for service as an officer.

158.    Upon information and belief, Deese was and/or would have been determined by the relevant medical authorities to be medically fit for duty as an officer when the Navy and DoD precluded him from serving further on the false basis that he was not medically fit for service as an officer.  That false determination caused Deese's inability to continue his service as an officer and directly caused his discharge.

159.    The assumption that Deese was not medically fit for duty was not only spread through official action internally but was also the underlying reason for discharge.  If a prospective external employer were to ask why Deese was abruptly discharged from the Navy shortly after graduating from the USNA, an unusual and therefore suspicious occurrence, Deese would be compelled to answer truthfully.  The defamatory rationale for his separation affected Deese's reputation and is affecting his employment prospects, depriving him of a liberty interest.

160.    If valid (which Deese disputes), the regulations or policies of the Navy and the DoD that prohibit midshipmen such as Deese from pursuing their chosen careers as officers, based solely on their HIV status, place upon them a false stigma that similarly deprives them of a liberty interest.  Instead of being afforded a medical evaluation and the process necessary to determine whether they are medically fit for duty, they are automatically and arbitrarily categorized as medically unfit and excluded from a range of employment opportunities as officers, despite hundreds of others with the same condition being allowed to continue to serve as officers in a multitude of positions.

35

161.    Through the actions and omissions above, Defendants Mattis, DoD, Spencer, Carter, and Chadwick have violated the Due Process Clause of the Fifth Amendment.

## COUNT  VII

**Violation of Procedural Due Process Under the Fifth Amendment
as to Doe's Discharge Against Defendants Mattis, Wilson, and DoD**

162.    All prior paragraphs are incorporated as if fully set forth herein.

163.    Plaintiff Doe was discharged purportedly because he was medically unfit for duty due to a medical condition (HIV) he acquired while on active duty.  While Plaintiff Doe does not agree that he was medically unfit, the Air Force's discharge entitled Plaintiff Doe to a DES process in accordance with Air Force and DoD regulations and chapter 61 of title 10 of the U.S. Code.  Plaintiff Doe has a property right in the benefits to which he is entitled as a service member who acquired, while on active duty, a condition the military deemed disabling.

164.    The actions taken by the Air Force and DoD placed a stigma or purported disability on Doe that led to a change in Doe's status and foreclosed his freedom to take advantage of employment opportunities and by broadly precluding him from continuing in his chosen career.  Moreover, Defendants' actions are more likely to result in the forced disclosure of Doe's HIV status in order to explain the discharge on his record.  As a result, the Defendants deprived Plaintiff Doe of a liberty interest.

165.    Doe was not afforded the process due, such as processing through the DES.  He was not given the opportunity to dispute to the proper authority through evidence, testimony, and a hearing that he was—and is—medically fit for service and fit for service as an officer.

166.    Doe had, in fact, been determined by the relevant medical authorities to be medically fit for duty as an officer when the Air Force and DoD precluded him from serving further on the false basis that he was not medically fit for service as an officer.  That false

36

determination caused Doe's inability to continue his service as an officer and directly caused his discharge.

167.    The assumption that Doe was not medically fit for duty was not only spread through official action internally but was also the underlying reason for discharge.  If a prospective external employer were to ask why Doe was abruptly discharged from the Air Force shortly after graduating from the USAFA, an unusual and therefore suspicious occurrence, Doe would be compelled to answer truthfully.  The defamatory rationale for his separation affected Doe's reputation and is affecting his employment prospects, depriving him of a liberty interest.

168.    If valid (which Doe disputes), the regulations or policies of the Air Force and the DoD that prohibit enlisted persons such as Doe from pursuing their chosen careers as officers, based solely on their HIV status, place upon them a false stigma that similarly deprives them of a liberty interest.  Instead of being afforded a medical evaluation and the process necessary to determine whether they are medically fit for duty, they are automatically and arbitrarily categorized as medically unfit and excluded from a range of employment opportunities as officers, despite hundreds of others with the same condition being allowed to continue to serve as officers in a multitude of positions.

169.    Through the actions and omissions above, Defendants Mattis, Wilson, and DoD have violated the Due Process Clause of the Fifth Amendment.

## COUNT  VIII

### Equitable Estoppel
### as to Plaintiff Doe Against Defendants Mattis, DoD, and Wilson

170.    All prior paragraphs are incorporated as if fully set forth herein.

171.    Through their conduct and statements, Defendants Mattis, DoD, and Wilson made a definite representation to Plaintiff Doe that he was medically fit for duty as a cadet and to commission as an officer.

172.    In reasonable reliance on the military's continued representations and assertions, Plaintiff Doe took an oath and committed to further service at risk of substantial financial penalty—to wit, repayment of approximately $400,000 in education expenses—if he did not commission.  He also made the decision to forgo other opportunities to find other forms of employment in reliance on these assertions.  He also decided not to re-enlist.

173.    Plaintiff Doe was not informed of any medical-based jeopardy to his ability to commission until well after he took a commitment oath and began his third year at the USAFA, despite the military officials' knowledge that his HIV status would jeopardize his ability to commission.

174.    After military doctors found Plaintiff Doe fit for duty, as well as fit to serve as an officer, and decided to give him a medical waiver to allow him to commission, the Air Force ultimately discharged Plaintiff Doe on the basis that he was not medically fit.

175.    Defendants therefore engaged in affirmative misconduct, because they behaved in ways that caused an egregiously unfair result, and Doe reasonably relied on such conduct to his detriment.

176.    Accordingly, based on equitable principles, Defendants should be estopped from basing Plaintiff Doe's disenrollment and discharge on the assertion that he was not medically fit.

38

177.     Plaintiff Doe is entitled to a declaration that Defendants Mattis, Wilson, and DoD are estopped from discharging him based on his HIV status.

## COUNT  IX

### Declaratory Judgment as to Plaintiff Doe
### Against Defendants Mattis, Wilson, and DoD

178.     All prior paragraphs are incorporated as if fully set forth herein.

179.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

180.     Despite subsequent actions taken by military officials indicating the contrary, Plaintiff commissioned as an officer in the Air Force upon graduation from the USAFA on June 2, 2016.

181.     The Department of Defense or the Air Force does not have authority to revoke or not recognize a completed commission.

182.     Plaintiff Doe is entitled to declaratory judgment that each commissioned as an officer in the Air Force.

## COUNT  X

### Violation of Equal Protection Under the Fifth Amendment's Due Process Clause
### (Based on HIV Status)
### as to Plaintiff Deese Against Defendants Mattis, DoD, Spencer, Carter, and Chadwick

183.     All prior paragraphs are incorporated as if fully set forth herein.

184.     The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials, or its employees.

185.    Defendants' accession policies discriminate impermissibly against people living with HIV both on their face and as-applied by barring people living with HIV from enlistment in the military and appointment as officers in the military based solely on their HIV status.

186.    Defendants routinely permit similarly situated individuals who are not HIV-positive, including but not limited to people with comparable chronic, manageable conditions, to enlist in the military, to commission as officers, and to deploy worldwide.

187.    Defendants have refused to commission Plaintiff Kevin Deese as an officer of the U.S. Navy based solely on his HIV status.

188.    Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than was described in *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

189.    Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

a. People living with HIV have suffered through a unique history of misinformation, stigma, ostracism, and discrimination for decades, and continue to suffer such discrimination to this day.

b. People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process.  A small minority of the overall population is currently living with HIV.  People living with HIV fear to disclose their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government.  For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not

adequately resourced by federal, state, and local governments.  Even today, many people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

c.  Particularly in light of dramatic medical advances—the benefits of which have only recently been fully understood and documented—a person's HIV status bears no relation to that person's ability to contribute to society.

d.  Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status.  While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their status as a condition of equal treatment.

190.   Defendants' disparate treatment of Plaintiff Deese and other individuals living with HIV deprives them of their right to equal dignity and stigmatizes them as second-class citizens in violation of equal protection guarantees.

191.   There is no longer a valid purpose for this disparate treatment, and neither is the classification at issue—HIV status—adequately tailored in service of any governmental interest. This disparate treatment is not even rationally related to a legitimate governmental interest, let alone serving an important or compelling governmental interest, or being substantially related or narrowly tailored to such an interest.  Thus, the enlistment ban and service restrictions cannot withstand any form of scrutiny and are invalid.

## COUNT  XI

**Violation of Equal Protection Under the Fifth Amendment's Due Process Clause**
**(Based on HIV Status)**
**as to Plaintiff Doe Against Defendants Mattis, DoD, and Wilson**

192.   All prior paragraphs are incorporated as if fully set forth herein.

41

193.    The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials, or its employees.

194.    Defendants' accession policies discriminate impermissibly against people living with HIV both on their face and as-applied by barring people living with HIV from enlistment in the military and appointment as officers in the military based solely on their HIV status.

195.    Defendants routinely permit similarly situated individuals who are not HIV-positive, including but not limited to people with comparable chronic, manageable conditions, to enlist in the military, to commission as officers, and to deploy worldwide.

196.    Defendants have refused to reinstate Plaintiff John Doe's commission as an officer of the U.S. Air Force based solely on his HIV status.

197.    Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than was described in *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

198.    Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

a.    People living with HIV have suffered through a unique history of misinformation, stigma and discrimination for decades, and continue to suffer such discrimination to this day.

b.    People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process.  A small minority of the overall

population is currently living with HIV.  People living with HIV fear to disclose their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government.  For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments.  Even today, many people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

c.  Particularly in light of dramatic medical advances—the benefits of which have only recently been fully understood and documented—a person's HIV status bears no relation to that person's ability to contribute to society.

d.  Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status.  While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their status as a condition of equal treatment.

199.    Defendants' disparate treatment of Plaintiff Doe and other individuals living with HIV deprives them of their right to equal dignity and stigmatizes them as second-class citizens in violation of equal protection guarantees.

200.    There is no longer a valid purpose for this disparate treatment, and neither is the classification at issue—HIV status—adequately tailored in service of any governmental interest. This disparate treatment is not even rationally related to a legitimate governmental interest, let alone serving an important or compelling governmental interest, or being substantially related or narrowly tailored to such an interest.  Thus, the enlistment ban and service restrictions cannot withstand any form of scrutiny and are invalid.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiffs' discharges were arbitrary, capricious, an abuse of discretion, and not in accordance with law;

B.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiffs' discharges were unconstitutional;

C.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiff Deese commissioned as an officer of the Navy;

D.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Plaintiff Doe commissioned as an officer in the Air Force;

E.  Vacate and set aside Plaintiffs' discharges;

F.  Enter an injunction directing the Department of Defense to commission Plaintiff Deese as an officer of the Navy or, in the alternative, requiring the Navy to re-evaluate Plaintiff Deese's eligibility for commissioning in light of any order of this Court enjoining enforcement of the regulations identified below;

G.  Enter an injunction directing the Department of Defense to reinstate Plaintiff Doe as a Second Lieutenant, or in the alternative, directing the Air Force to reinstate Plaintiff Doe as a graduated cadet at the U.S. Air Force Academy and requiring the Air Force to re-evaluate Plaintiff Doe's eligibility for commissioning in light of any order of this Court enjoining enforcement of the regulations identified below;

H.  Enjoin the Navy from using SECNAV Instruction 5300.30E to bar or to disenroll from a commissioning program, or discharge from the service, any person diagnosed with HIV while on active duty, including U.S. Naval Academy Midshipmen;

I.  Enjoin the Air Force from using AFI 44-178 to bar or to disenroll from a commissioning program, or discharge from the service, any person diagnosed with HIV while on active duty, including U.S. Air Force Academy Cadets;

J.  Enjoin the Department of Defense from applying or enforcing the HIV-specific provision on the list of "Medical Conditions Usually Precluding Contingency Deployment" (DoDI 6490.07, Enclosure 3, subsection (e)(2));

K.  Enjoin the Department of Defense from allowing or using DoDI 6485.01—or any service-specific regulation that derived from any version of DoDI 6485.01—to bar, to disenroll from an officer program, or to discharge from the military, any service academy or officer training applicant or member diagnosed with HIV while on active duty;

L.  Issue an injunction directing that HIV-positive service members, including service academy cadets or midshipmen, not found medically fit for duty and not otherwise receiving a waiver or exception to policy, undergo DES processing in the same manner as those with any other illness or injury;

M.  Award Plaintiffs reasonable costs and attorneys' fees;

N.  Award such further relief as this Court deems appropriate.

Dated: August 28, 2018

Peter Perkowski*
PeterP@outserve.org
OUTSERVE-SLDN, INC.
P.O. Box 65301
Washington, DC 20035-5301
T: 1-800-538-7418

Scott A. Schoettes*
SSchoettes@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 W. Adams Street, Suite 2600
Chicago, IL 60603
T: 1-312-663-4413

Anthony Pinggera*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
T: 1-213-382-7600

Barton F. Stichman*
Bart_Stichman@nvlsp.org
Rochelle Bobroff*
Rochelle@nvlsp.org
NATIONAL VETERANS LEGAL
SERVICES PROGRAM (NVLSP)
1600 K Street, NW, Suite 500
Washington, DC 20006
T: 1-202-265-8305

*Attorneys for Plaintiffs*
*Pro hac vice application forthcoming*

Respectfully submitted,

/s/ Zachary Cohen
Zachary B. Cohen (M.D. Bar #___)
ZCohen@winston.com
Geoffrey P. Eaton*
GEaton@winston.com
J.C. Masullo*
JMasullo@winston.com
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
T: 1-202-282-5000
F: 1-202-282-5100

Bryce A. Cooper*
BCooper@winston.com
Jason Z. Pesick*
JPesick@winston.com
Sarah Bily*
SBily@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
T: 1-312-558-5600

Patrick Opdyke*
POpdyke@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
T: 212-294-6700