# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

KEVIN DEESE, *et al.*,

      *Plaintiffs*,

  v.

MARK T. ESPER,
Secretary of Defense, *et al.*,

      *Defendants*.

Civil Action No. 1:18-cv-02669-RDB

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................. 3

      A.    The Advanced State of HIV Medicine................................................. 3

      B.    Defendants' Discriminatory Policies .................................................... 4

            1.    DoD, Navy, and Air Force Policies Governing Active Duty
                  Service Members with HIV .................................................... 4

            2.    The Alleged Bases for the DoD, Navy, and Air Force HIV Policies ........ 8

      C.    Plaintiffs Were Discharged Based Solely on Their HIV Status ............................ 9

            1.    Deese Met the Requirements to Commission as a Naval Officer but
                  Was Discharged Based on His HIV Status .................................... 9

            2.    Doe Met the Requirements to Commission as an Air Force Officer,
                  and His Commission Was Wrongly Revoked Based on His HIV
                  Status............................................................................. 12

III.  ARGUMENT................................................................................................... 14

      A.    Plaintiffs' Claims Are Justiciable and Satisfy the *Mindes* Framework ................ 14

            1.    The Nature and Strength of the Claims Warrant Judicial Review........... 15

            2.    Plaintiffs Have Suffered and Continue to Suffer Serious Injury .............. 18

            3.    Judicial Review of Plaintiffs' Claims Does Not Interfere with the
                  Military's Function or Discretion ........................................... 22

      B.    Deese Satisfies the Redressability Requirement of Article III Standing,
            Because Thrombocytopenia Does Not Preclude Commissioning Here ............... 26

      C.    Plaintiffs Have Alleged Viable Equal Protection Claims in Counts IX and
            X...................................................................................... 26

            1.    Plaintiffs Have Sufficiently Alleged That Defendants'
                  Discriminatory Policies Will Not Survive Even Rational Basis
                  Review ............................................................................. 27

            2.    Plaintiffs Sufficiently Alleged That Heightened Scrutiny Should
                  Apply................................................................................. 29

i

D.    Plaintiffs Have Alleged Viable APA Claims in Counts I–V ................................ 32

       1.    The APA Does Not Preclude Review of Plaintiffs' Claims .................... 33

       2.    Plaintiffs Have Sufficiently Alleged Violations of the APA in Counts I–V ................................................................................................ 36

             a)    Plaintiffs Have Sufficiently Alleged in Counts III, IV, and V that Defendants' Policies Categorically Barring Service Members with HIV from Commissioning Violate the APA ........ 37

             b)    Plaintiffs Have Sufficiently Alleged in Counts I and II That Defendants Violated the APA by Not Recognizing Waivers from, or Submitting ETPs to, the Appropriate Authorities........... 40

E.    Doe Has Alleged a Viable Procedural Due Process Claim in Count VI .............. 43

F.    Doe Has Alleged a Viable Equitable Estoppel Claim in Count VII .................... 46

IV.    CONCLUSION .............................................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akbarin v. INS,*
    669 F.2d 839 (1st Cir. 1982) .................................................................46

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999)..............................................................................43

*AT&T Info. Sys., Inc. v. Gen. Servs. Admin.,*
    810 F.2d 1233 (D.C. Cir. 1987) ..........................................................33

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986)............................................................................33

*Brown v. Glines,*
    444 U.S. 348 (1980)............................................................................17

*Camp v. Pitts,*
    411 U.S. 138 (1973)............................................................................33

*Casa De Md. v. U.S. Dep't of Homeland Sec.,*
    924 F.3d 684 (4th Cir. 2019) ..........................................................33, 34

*Chawla v. Transam. Occidental Life Ins. Co.,*
    440 F.3d 639 (4th Cir. 2006) ..............................................................47

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)............................................................................33

*Connecticut v. Doehr,*
    501 U.S. 1 (1991)...............................................................................45

*Dibble v. Fenimore,*
    339 F.3d 120 (2d Cir. 2003).................................................................17

*Dillard v. Brown,*
    652 F.2d 316 (3d Cir. 1981).................................................................22

*Doe 1 v. Trump,*
    275 F. Supp. 3d 167 (D.D.C. 2017))...........................................22, 23, 32

*Doe v. Univ. of Md. Med. Sys. Corp.,*
    50 F.3d 1261 (4th Cir. 1995) ..............................................................32

iii

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...................................................................8

*Emory v. Sec'y of Navy*,
    819 F.2d 291 (D.C. Cir. 1987) ...............................................................18

*Ergon-W. Va., Inc. v. EPA*,
    896 F.3d 600 (4th Cir. 2018) .................................................................37

*Fox v. Morton*,
    505 F.2d 254 (9th Cir. 1974) .................................................................46

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).................................................................................17

*Garvey v. NTSB*,
    190 F.3d 571 (D.C. Cir. 1999) ...............................................................41

*Goldman v. Weinberger*,
    475 U.S. 503 (1986).................................................................................17

*Guerra v. Scruggs*,
    942 F.2d 270 (4th Cir. 1991) .................................................................14

*Harrison v. Spencer*,
    No. 18–641 (E.D. Va. 2018) .................................................14, 20, 26

*Heckler v. Chaney*,
    470 U.S. 821 (1985).................................................................................34

*Inova Alexandria Hosp. v. Shalala*,
    244 F.3d 342 (4th Cir. 2001) ...........................................................33, 34

*Johnson v. United States*,
    610 F. Supp. 2d 491 (D. Md. 2009) ..................................................47, 49

*Khalsa v. Weinberger*,
    779 F.2d 1393 (9th Cir. 1985) ...............................................................22

*Kreis v. Sec'y of Air Force*,
    406 F.3d 684 (D.C. Cir. 2005) ...........................................................37, 39

*Larsen v. U.S. Navy*,
    486 F. Supp. 2d 11 (D.D.C. 2007) .....................................................19, 20

*Lincoln v. Vigil*,
    508 U.S. 182 (1993).............................................................................33, 35

*Lucero v. Early*,
  873 F.3d 466 (4th Cir. 2017) ..............................................................29

*Mathews v. Lucas*,
  427 U.S. 495 (1976)..........................................................................27

*Matlovich v. Sec'y of Air Force*,
  591 F.2d 852 (D.C. Cir. 1978) ..........................................................18

*McNeill v. Butz*,
  480 F.2d 314 (4th Cir. 1973) ............................................................44

*Md. Gen. Hosp., Inc. v. Thompson*,
  308 F.3d 340 (4th Cir. 2002) ............................................................40

*Mem. Hosp. v. Maricopa County*,
  415 U.S. 250 (1974)..........................................................................28

*Mindes v. Seaman*,
  453 F.2d 197 (5th Cir. 1971) .......................................................15, 17

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................3, 37, 39

*Nelson v. Peckham*,
  210 F.2d 574 (4th Cir. 1954) ............................................................19

*Orloff v. Willoughby*,
  345 U.S. 83 (1953).............................................................................19

*Owens v. Brown*,
  455 F. Supp. 291 (D.D.C. 1978) .......................................................22

*Parker v. Levy*,
  417 U.S. 733 (1974)..........................................................................17

*Plyler v. Doe*,
  457 U.S. 202 (1982)..........................................................................27

*Porter v. Califano*,
  592 F.2d 770 (5th Cir. 1979) ............................................................24

*Reg'l Mgmt. Corp. v. Legal Servs. Corp.*,
  186 F.3d 457 (4th Cir. 1999) ............................................................38

*Ridpath v. Bd. of Governors of Marshall Univ.*,
  447 F.3d 292 (4th Cir. 2006) ............................................................44

*Roe v. Department of Defense,*
  947 F.3d 207 (4th Cir. 2020) ........................................................ *passim*

*Rostker v. Goldberg,*
  453 U.S. 57 (1981) ............................................................................. 17

*Sandidge v. Washington,*
  813 F.2d 1025 (9th Cir. 1987) ........................................................... 22

*Sciolino v. City of Newport News,*
  480 F.3d 642 (4th Cir. 2007) ............................................................. 44

*Serv. Women's Action Network v. Mattis,*
  320 F. Supp. 3d 1082 (N.D. Cal. 2018) .................................. 17, 22, 24

*Sierra Club v. Dep't of Interior,*
  899 F.3d 260 (4th Cir. 2018) ............................................................. 37

*Southern Railway Co. v. Seaboard Allied Milling Corp.,*
  442 U.S. 444 (1979) ........................................................................... 34

*Sun Il Yoo v. INS,*
  534 F.2d 1325 (9th Cir. 1976) ........................................................... 46

*Thakkar v. United States,*
  389 F. Supp. 3d 160 (D. Mass. 2019) ................................................ 46

*Thomas Jefferson Univ. v. Shalala,*
  512 U.S. 504 (1994) ..................................................................... 32, 40

*United States v. Carolene Prods. Co.,*
  304 U.S. 144 (1938) ........................................................................... 30

*United States v. Hemme,*
  476 U.S. 558 (1986) ........................................................................... 45

*United States v. Virginia,*
  518 U.S. 515 (1996) ........................................................................... 17

*United States v. Wharton,*
  514 F.2d 406 (9th Cir. 1975) ............................................................. 47

*Vance v. United States,*
  434 F. Supp. 826 (N.D. Tex. 1977) .................................................... 19

*Watkins v. U.S. Army,*
  875 F.2d 699 (9th Cir. 1989) ...................................................... *passim*

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012)................................................................30

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)...............................................................................25

*Witt v. Dep't of the Air Force*,
   739 F. Supp. 2d 1308 (W.D. Wash. 2010)..........................................22

*Woods v. City of Greensboro*,
   855 F.3d 639 (4th Cir. 2017) .............................................................32

**Statutes**

5 U.S.C. § 702......................................................................................38

5 U.S.C. § 706(2)(A)......................................................................32, 36

10 U.S.C. § 101(d)(1) ...............................................................4, 5, 12

10 U.S.C. § 532(a)(3)....................................................................34, 35

**Other Authorities**

AFI 36-3504.........................................................................................14

AFI 44-178 .................................................................................. *passim*

AFI 48-123 .................................................................................. *passim*

SECNAVINST 5300.30E ....................................................................37

SECNAVINST 5300.30F ....................................................................38

U.S. Const., amend. I ..........................................................................17

U.S. Const., amend. V..............................................................19, 43, 45

## I.      INTRODUCTION

Plaintiffs Deese and Doe were active duty members of military service academies who tested positive for HIV before graduation.  They were discharged under Department of Defense ("DoD"), Navy, and Air Force policies that categorically bar service academy graduates living with HIV from commissioning as officers.  While these policies permit graduates with a host of other disqualifying medical conditions to commission with a waiver or exception to policy ("ETP") from the appropriate authority, Defendants single out service members living with HIV for starkly different treatment.  Despite unanimous support to commission from their physicians and commanding officers, Plaintiffs faced an ill-informed, categorical ban barring them from continuing their service.  Plaintiffs bring this lawsuit because DoD, Navy, and Air Force policies that treat them—and others living with HIV—differently from other service members with manageable medical conditions having no effect on their ability to serve are arbitrary, capricious, contrary to law, an abuse of discretion, and a violation of Plaintiffs' constitutional rights.

Defendants argue, as they did in a 2018 DoD Report to Congress (the "2018 DoD Report"), that their "evidence-based policies governing the accession and retention of" service members with HIV are "the product of reasoned decisionmaking" and "recogniz[e] the medical consensus about the positive results from modern medication management of HIV infection."  ECF 42-1 (Defs.' Mem.) at 4, 48.[1]  But Defendants' justifications for their eligibility policies for people with HIV were flatly rejected by the Fourth Circuit just two months ago in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020).  In that case, which challenged DoD's policies of separating service members with HIV based on regulations that preclude their deployment, the Court found that "each

_____

[1] "ECF" page references refer to the page numbers imprinted by the Court's CM/ECF system at the top of the page.

explanation offered by the Government [in the 2018 DoD Report] is unsupported by the record or contradicted by scientific evidence, leading us to conclude Plaintiffs have adequately shown that the Government failed to consider the relevant evidence and offers explanations so contrary to that evidence as to be arbitrary." *Id.* at 225.

Defendants argue *Roe* is distinguishable, because "[r]etention and opportunities for deployment are not at issue" in this case. ECF 42-1 at 28. But that misstates both the reality behind Defendants' decisions to bar Plaintiffs from commissioning and the Fourth Circuit's decision in *Roe*. In fact, Defendants expressly concede that their decision to commission academy midshipmen and cadets is inexorably linked to their ability "*to serve and deploy worldwide in any capacity*." *Id.* at 36 (emphasis in original). This makes directly applicable the Fourth Circuit's holding that the *Roe* "[p]laintiffs have shown they are likely to succeed on their claim that the deployment policies at issue violate the APA because the Government has not—and cannot— reconcile these policies with current medical evidence." 947 F.3d at 220.

Defendants try to avoid the same result here by focusing on the difference between accession standards for commissioning service academy graduates and retention standards for already enlisted or commissioned service members. But this case is not about whether DoD has a reasonable basis for "utilizing the accession medical standards when determining one's eligibility for an officer's commission" *generally*. ECF 42-1 at 46. It is about whether Defendants' *specific* policies precluding the commissioning of active duty service members living with HIV violate the APA and the Constitution. And the Fourth Circuit has confirmed that categorically precluding service members from continuing their service based on HIV status alone presents a justiciable military decision. *Roe*, 947 F.3d at 218–19.

To prevail on the merits of either their APA or equal protection claims, even if rational

basis review is applied, Defendants must provide "a rational connection between the facts" concerning HIV treatment and prevention and "the choice made" to institute a categorical ban barring service academy graduates with HIV from commissioning, regardless of whether that ban is implemented pursuant to so-called deployability, retention, or accession standards. *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants have not and cannot provide any basis for departing from the Fourth Circuit's recent conclusion that "any understanding of HIV that could justify" a ban "is outmoded and at odds with current science. Such obsolete understandings cannot justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments." *Roe*, 947 F.3d at 228. Early-stage dismissal of Plaintiffs' APA and equal protection claims under these circumstances would be reversible error.

The Court should also deny Defendants' motion to dismiss Doe's remaining claims alleging a constitutional due process violation and equitable estoppel. His constitutional due process claim is sufficiently alleged, because he asserts a protected liberty interest premised on the DoD's false statement that he is unfit for duty, causing him to face social stigma and/or forced disclosure of his HIV status. And because Doe has alleged affirmative misconduct by the Air Force that goes beyond mere negligence and caused a serious injustice, his equitable estoppel claim should also survive. Defendants' motion should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     The Advanced State of HIV Medicine

The Fourth Circuit recently recognized the remarkable medical advances that have made HIV "a chronic, *treatable* condition." *Roe*, 947 F.3d at 213 (emphasis added); ECF 33 (Amended Complaint) ¶ 31. "Today, there is an effective treatment regimen for virtually every person living with HIV" that consists of one pill a day and causes "minimal side effects." *Roe*, 947 F.3d at 213;

3

ECF 33 ¶ 30.  "With adherence to treatment, an HIV-positive person's viral load becomes 'suppressed' within several months and the virus reaches 'undetectable' levels shortly thereafter"; ultimately, "[t]hose who are timely diagnosed and treated experience few, if any, noticeable effects on their physical health and enjoy a life expectancy approaching that of those who do not have HIV."  *Roe*, 947 F.3d at 213–14; ECF 33 ¶ 31.

Medical researchers have also established that a person with a suppressed viral load is incapable of transmitting HIV.  *Id.* ¶ 32.  People who "maintain an undetectable viral load have effectively no risk of sexually transmitting the virus," and "risk of transmission from a person with an undetectable viral load through non-sexual means [other than blood transfusions] ... is very low, if such a risk exists at all."  *Roe*, 947 F.3d at 214 (quoting CDC report).  In fact, "HIV is not easily transmitted," even when untreated.  *Id.* at 213; ECF 33 ¶¶ 31–33.  "[T]ransmission is unlikely" even when "certain infected body fluids ... encounter damaged tissue, a mucous membrane, or the bloodstream."  *Roe*, 947 F.3d at 213; ECF 33 ¶¶ 32-33.

HIV simply is not the same disease it was once perceived to be.  ECF 33 ¶ 34.  Today, HIV is a chronic, manageable condition, not a terminal diagnosis.  *Id.* ¶ 31.  Despite tremendous breakthroughs in the treatment and prevention of HIV, however, people living with HIV continue to be subjected to stigma, ostracism, and discrimination rooted in misconceptions, fear, and ignorance that is deeply rooted in the psyches of some in our society.  *Id.* ¶ 34.

## B.   Defendants' Discriminatory Policies

### 1.   DoD, Navy, and Air Force Policies Governing Active Duty Service Members with HIV

United States Naval Academy ("USNA") midshipman and United States Air Force Academy ("USAFA") cadets are members of the military on active duty.  *See*, *e.g.*, 10 U.S.C. § 101(d)(1) ("The term 'active duty' ... includes ... attendance, while in the active military service,

at a school designated as a service school by law or by the Secretary of the military department concerned.").

Department of Defense Instruction ("DoDI") 6485.01, titled "Human Immunodeficiency Virus (HIV) in Military Service Members," provides that active duty service members who test positive for HIV are "referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses." DoDI 6485.01 at Encl. 3 ¶ 2(c) (ECF 1-3 at 8). DoDI 6485.01 presumes that some Service members will be "fit for duty" and "will be allowed to serve." *Id.*

Secretary of the Navy ("SECNAV") Instruction 5300.30E, titled "Management of Human Immunodeficiency Virus, Hepatitis B Virus, and Hepatitis C Virus Infection in the Navy and Marine Corps," implements DoD HIV policy for active duty service members of the Navy. It provides that "Military personnel with serologic evidence of HIV ... shall be referred for medical evaluation regarding continued service and appropriate treatment in the same manner as personnel with other progressive illnesses." SECNAV Instruction 5300.30E ¶ 3(c) (ECF 1-4 at 4). The Naval Instruction states that "[m]ilitary personnel with serologic evidence of HIV infection who are determined to be fit for continued military service shall not be retired or separated solely on the basis of serologic evidence of HIV infection." *Id.* ¶ 3(c)(1) (ECF 1-4 at 4).

Air Force Instruction ("AFI") 44-178, titled "Human Immunodeficiency Virus Program," implements DoD HIV policy for active duty service members of the Air Force. It states that active duty members "who test positive for HIV are referred ... for medical evaluation ... for the purpose of determining status for continued military service." AFI 44-178 ¶ 2.4 (ECF 1-11 at 6). The Air Force regulation provides that "[m]embers with laboratory evidence of HIV infection who are able to perform the duties of their office, grade, rank and/or rating, may not be separated solely on the

basis of laboratory evidence of HIV infection." *Id.* ¶ A.9.1.1 (ECF 1-11 at 37).

However, the Navy and Air Force apply different standards for commissioning USNA midshipman and USAFA cadets living with HIV upon graduation from their respective military academies, notwithstanding their active duty status while serving at the academies. HIV-positive individuals are precluded from commissioning as officers upon graduation. *See* DoDI 6485.01 ¶ 3(a) (ECF 1-3 at 2). The Navy's instruction states that "USNA midshipmen shall be processed for separation from the Naval Academy and discharged when confirmed HIV positive." SECNAV 5300.30E ¶ 4(c)(3) (ECF 1-4 at 7). The Air Force instruction directs to "Separate Air Force Academy cadets ... from the Academy" upon "serologic evidence of HIV infection." AFI 44-178 ¶ A2.5.3 (ECF 1-11 at 16).

However, according to DoD regulations, graduates of the Navy and Air Force academies may seek a waiver of "medical standards for appointment [including commissioning], enlistment, or induction into the Military Services," including for otherwise disqualifying medical conditions. DoDI 6130.03 ¶ 4(b) (ECF 1-1 at 3); Encl. 2 ¶ 3(b) (ECF 1-1 at 8); Encl. 4 ¶¶ 1(a), 2 (ECF 1-1 at 11); Encl. 4 ¶ 24(b) (ECF 1-1 at 39). Navy and Air Force regulations prescribe who can grant these waivers.

USNA Instruction 6130.1B, which governs "Processing Midshipmen Medical Evaluation Boards and Commissioning Decisions" and was the version of the regulation in effect at the time of Mr. Deese's discharge,[2] provides that the Superintendent of the USNA is authorized to grant a waiver and commission midshipmen with disqualifying medical conditions, including HIV. The Superintendent will receive commissioning recommendations from the Bureau of Medicine and

---

[2] Plaintiffs' Amended Complaint cites a prior version of this instruction, USNA Instruction 6130.1A. *See*, *e.g.*, ECF 33 ¶¶ 26, 60, 115, citing USNA Instruction 6130.1A (ECF 1-6). The applicable version of the instruction is attached as Exhibit D.

Surgery (BUMED) and the Naval Health Clinic Annapolis Commanding Officer (NHCA CO), the midshipman's personal statement, and the Brigade Medical Officer's surrebuttal, if any. Ex. D at 4, USNA Instruction 6130.1B ¶ 6(c). But "[a]s the commissioning authority, the Superintendent may choose to waive a medical commissioning standard, *even against medical recommendation(s)*, and *commission any midshipman*." *Id.* ¶ 6(c)(1) (emphasis added). The regulation's "Process Map" confirms that midshipmen identified as having a "disqualifying medical or mental health condition" go through a series of medical evaluations, including by BUMED, and that authority for the "final decision" on commissioning rests with the Superintendent. *Id.* at 6, Encl. 1; *see also* USNAINST 1301.5F, "Midshipmen Service Assignment," ¶ 4(a) ("The Superintendent ... approves Midshipmen Service Assignments") (ECF 1-7 at 2); *id.* ¶ 5(a)(1)(a) ("BUMED will make recommendations for medical waivers ... Only the Superintendent may designate a midshipman not physically qualified (NPQ) for commissioning.") (ECF 1-7 at 3).

AFI 48-123, which governs "Medical Examinations and Standards" for members of the Air Force, provides that the Surgeon General of the USAFA (the "USAFA/SG")—the Academy's chief medical officer—is authorized to grant a waiver and commission Air Force cadets with disqualifying medical conditions. The instruction specifically identifies the "individuals and organizations with authority to grant a waiver for medically disqualifying defects." AFI 48-123 ¶ 6.3 (ECF 1-9 at 45). And the "Waiver Authority" for "Initial Commission[ing]" of USAFA cadets is the USAFA/SG. *Id.* at Attach. 2, Table A2.1 (ECF 1-9 at 91-94). However, AFI 44-178 provides that "[w]aiver for HIV infection is not authorized." *Id.* ¶ 2.2.1 (ECF 1-11 at 6).

If the Superintendent of the USNA or the USAFA/SG does not or cannot waive the accession medical standard for a graduating midshipman or cadet living with HIV, the affected

7

service member can seek an "exception to policy" for the applicable instruction.  ECF 33 ¶ 44.

### 2.    The Alleged Bases for the DoD, Navy, and Air Force HIV Policies

As alleged in the Amended Complaint, Defendants' policies precluding graduating service academy members with HIV from commissioning as officers are "an unfortunate vestige of a time when HIV was untreatable and invariably fatal—an anachronism whose justifications no longer comport with modern medical science."  ECF 33 ¶ 13.  These policies "discriminate impermissibly against people living with HIV both on their face and as applied by barring people living with HIV from ... appointment as officers in the military based solely on their HIV status."  *Id.* ¶ 177.

Defendants argue that policies preventing graduating service academy members with HIV from commissioning as officers "are based on the current medical evidence about how HIV is contracted and transmitted to uninfected service members, the ability of an HIV-positive service member to continue service without exacerbating his or her condition or risking the military mission, the impact of having HIV infected personnel on commands, and the safety of the military blood supply."  ECF 42-1 at 13–14.  Defendants rely repeatedly on the 2018 DoD Report to support their positions.  *Id.* (citing ECF 42-3).[3]

However, in reviewing a related challenge to DoD's policy of non-deployment for HIV-positive service members, the Fourth Circuit recently rejected the justifications set forth in the

---

[3] Defendants attach several exhibits to their brief, ostensibly to support factual assertions made in support of their motion.  While the Court should not consider these documents on a motion to dismiss, they serve only to highlight the significant factual disputes at the heart of this case and confirm that Defendants' motion is both premature and unfounded.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.  However, the district court cannot go beyond these documents on a Rule 12(b)(6) motion; if it does, it converts the motion into one for summary judgment.  Such conversion is not appropriate where the parties have not had an opportunity for reasonable discovery.").

2018 DoD Report.  *Roe*, 947 F.3d at 225.  Ruling on the same arguments supporting a ban on deploying HIV-positive service members overseas, the Court found that "each explanation offered by the Government for the policy is unsupported by the record or contradicted by scientific evidence."  *Id.*  For example, in *Roe*, the DoD claimed—as it had in the 2018 DoD Report and Defendants do again here—that there is a risk of HIV transmission through battlefield blood exposure and blood transfusions.  ECF 42-1 at 10.  But "the Government [] failed to reconcile these concerns with the record evidence on HIV transmission," according to the Fourth Circuit.  *Roe*, 947 F.3d at 227.  In fact, the Court found that "the military's own research undermines the Government's purported concern."  *Id.*  For example, in a military study of 1.13 million service members deployed to Afghanistan or Iraq during a six-year period, "the military found *no* instances of transmission through trauma care, blood splash, transfusion, or other battlefield circumstances."  *Id.* at 228 (emphasis original).  The Court concluded that "any understanding of HIV that could justify this ban is outmoded and at odds with current science.  Such obsolete understandings cannot justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments."  *Id.*

## C.   Plaintiffs Were Discharged Based Solely on Their HIV Status

### 1.   Deese Met the Requirements to Commission as a Naval Officer but Was Discharged Based on His HIV Status

Kevin Deese dreamed of serving his country as a Navy officer ever since his older brother was a student at the USNA.  ECF 33 ¶¶ 35, 46.  Deese secured a coveted spot at the Academy and became a midshipman in 2010.  *Id.* ¶¶ 35–36; N.A.R. at DeeseAR000040–41.[4]  He earned high grades, good performance reviews, and a number of honors, while consistently seeking out

---

[4] Citations to "N.A.R." refer to the Navy's administrative record, filed under seal with the Court at ECF 38.

additional responsibilities and challenges.  ECF 33 ¶¶ 37–38; N.A.R. at DeeseAR000010–12, 40, 41.  As Deese neared graduation, he applied early for the Navy's selective, elite nuclear submarine program for officers.  ECF 33 ¶ 40.  He demonstrated the requisite excellence in STEM subjects and successfully completed an interview with a four-star admiral.  *Id.*

Weeks before graduation, Deese decided to apply for an optional dive program.  *Id.* ¶ 41. Deese had passed all of his medical examinations while he was a student, including the final one required for commissioning, but the dive program required additional medical screening not required of other USNA officer candidates.  *Id.* ¶ 39.  On April 1, 2014, Deese learned from Captain Bill Byrne, then the Commandant of the Naval Academy, that these additional medical tests revealed he was HIV-positive.  *Id.* ¶ 42.

Captain Byrne told Deese that, based on this diagnosis, he would not be commissioned as an officer in the Navy upon graduation.  *Id.*  Captain Byrne did not cite any legal or regulatory basis for this decision or arrange for Deese to be evaluated by a Medical Evaluation Board (MEB) or Physical Evaluation Board (PEB).  *Id.*; *see also* Ex. D at 2, USNA Instruction 6130.1B, ¶ 4 ("An MEB should be initiated when the Brigade Medical Officer (BMO) determines that a midshipman is potentially not commissionable based on commissioning standards").  Instead, Captain Byrne informed Deese that he would not be able to obtain a waiver or exception to policy permitting him to commission.  ECF 33 ¶ 44.

Nevertheless, on May 23, 2014, Deese participated in the same induction and commitment ceremonies as his classmates and received the same diploma.  *Id.* ¶ 45; N.A.R. at DeeseAR000013–14.  At that time, he was medically fit to serve as an officer and to deploy on a surface ship.  ECF 33 ¶ 47; N.A.R. at DeeseAR000005–6, DeeseAR000009.  Yet, despite Deese's outstanding credentials—and the hundreds of thousands of taxpayer dollars invested in his

education and training—he was denied the commission he had rightfully earned, solely because of his HIV diagnosis.  ECF 33 ¶¶ 47, 63; N.A.R. at DeeseAR000002, DeeseAR000027.

Deese secured significant support for a waiver or ETP to commission.  ECF 33 ¶¶ 50–55. His treating infectious disease specialist at Walter Reed National Military Medical Center, Major (ret.) Jason M. Blaylock, M.D., wrote that Deese "demonstrated excellent compliance" with treatment, resulting in "a consistently undetectable HIV viral load," "robust immune reconstitution," and "no complications," and "remains fit for duty."  *Id.* ¶ 51; N.A.R. at DeeseAR000009.  Importantly, Vice Admiral Walter E. Carter, Superintendent of the USNA, supported Deese's commissioning, finding that "He is in good health and capable of performing his duties."  ECF 33 ¶ 55; N.A.R. at DeeseAR000005–6.  Superintendent Carter believed that Deese's commissioning would "achieve the DoD objective of retaining service members after they have been extensively trained, so long as they are capable of performing their duties."  *Id.*

Despite Superintendent Carter's support, Deese received his discharge papers in May 2017. ECF 33 ¶ 56; N.A.R. at DeeseAR000002.  The stated basis for Deese's discharge was that he was not medically fit for duty—contrary to the opinions of his doctors and commanders.  ECF 33 ¶ 57; N.A.R. at DeeseAR000002.[5]

---

[5] Defendants admit Deese did not receive the required DES processing to effectuate a discharge at the time of his separation.  ECF 42-1 at 6, n.2.  The parties agreed to stay the proceedings for additional administrative proceedings, including for Deese to complete DES processing.  *See* ECF 22, 24, 26, 31.  The Physical Evaluation Board found that "Deese remains clinically well with an undetectable viral load and no complications from his HIV infection."  Ex. A at 4 ¶ 9.  However, consistent with Defendants' position here, the Board concluded that "this condition precludes commissioning in the United States Navy," citing SECNAVINST 5300.30E.  *Id.* ¶ 7.

### 2. Doe Met the Requirements to Commission as an Air Force Officer, and His Commission Was Wrongly Revoked Based on His HIV Status

John Doe (proceeding under a pseudonym here, *see* ECF 2) enlisted in the Air Force in 2009 and rose to the rank of Senior Airman. ECF 33 ¶¶ 65–66. He remained on active duty when he became a cadet at the USAFA in 2012. *Id.* ¶ 67; *see* 10 U.S.C. §§ 101(d)(1), 516; A.R. at 029.[6] In February 2014, during his second year, Doe was diagnosed with HIV following a routine physical examination. ECF 33 ¶ 68; A.R. at 012. Doe underwent an informal medical review procedure on May 30, 2014, where the Deployment Availability Working Group determined that Doe was medically fit to return to duty. ECF 33 ¶¶ 68–69.

Later that summer, Doe took the "commitment oath" along with the other cadets in his class, vowing to serve for an additional two years at the USAFA as a cadet and five years after graduation as an officer. *Id.* ¶ 73. Accordingly, Doe did not re-enlist when his original term of enlistment ended in January 2015. *Id.* ¶ 75.

In the summer of 2015, he received a return-to-duty authorization indicating that he was medically fit to serve, and in November he received a waiver from Lt. Gen. Michelle D. Johnson, Superintendent of the Air Force Academy, to continue his service there. *Id.* ¶ 72; A.R. at 014, 22.

At some point in the fall of 2015, Air Force officials led certain USAFA personnel to believe that AFI 44-178 required Doe to be disenrolled. ECF 33 ¶ 77; *see also* A.R. at 015. USAFA officials, however, believed (rightly) that Doe was medically fit to perform the duties of an officer and should be allowed to commission. ECF 33 ¶ 77; A.R. at 014, 016–17. Accordingly, they sought an exception to DoDI 6485.01 from its author, the Undersecretary of Defense for Personnel and Readiness. ECF 33 ¶ 77; ECF 1-3 at 3.

---

[6] Citations to "A.R." refer to the Air Force's administrative record, filed under seal at ECF 39.

In pursuit of a medical waiver and/or ETP, Doe secured the support of all of the medical officers who had evaluated and treated him; the Judge Advocate and Surgeon General of the Academy (its chief legal and medical officers); the director of the Air Force's Medical Evaluation Unit; and every officer in Doe's chain of command, including the Superintendent—a three-star General—and every other senior officer at the Academy.  *Id.* ¶¶ 78–83.

Initially, it appeared that Doe's efforts were successful.  On April 12, 2016, the Air Force issued orders assigning Doe to be a Second Lieutenant and contracting officer at Joint Base Andrews in Maryland.  *Id.* ¶ 84.  When Doe graduated from the Academy on June 2, 2016, he took the oath along with the rest of his graduating class and received a certificate of commissioning, signed by the Secretary of the Air Force, stating that he had been commissioned as a Second Lieutenant.  *Id.* ¶¶ 85–89; A.R. at 014.

Doe soon learned, however, that despite having completed the commissioning process, the Air Force was holding him in cadet status while the ETP was being processed.  ECF 33 ¶ 90.  At the end of July, after numerous inquiries, he learned that the ETP request had been delayed by a "rewrite ... at the Pentagon."  *Id.* ¶¶ 91–92.

In September 2016—a month after he was supposed to have reported to Andrews—Doe received a third return-to-duty waiver from military physicians deeming him medically fit to serve.  *Id.* ¶¶ 84, 93.  Just weeks later, he learned that the Chief of Staff of the Air Force—who had intercepted the ETP request from the Undersecretary—was recommending that Doe not be commissioned.  *Id.* ¶¶ 95–96.  On October 13, Doe received formal notice that the ETP request had been denied.  *Id.* ¶ 99; A.R. at 001.  On October 26, 2016, Jeffrey R. Mayo, Deputy Assistant Secretary of the Air Force for Force Management Integration, informed the USAFA's commander that the Secretary of the Air Force had denied Doe's ETP request and approved of taking action to

13

separate and discharge him.  ECF 33 ¶ 100; A.R. at 001.

Doe was discharged on November 1, 2016.  ECF 33 ¶ 101.  His DD-214 discharge paperwork listed "Secretarial Authority" as the reason for separation and cited AFI 36-3504.  *Id.* ¶ 102.  Doe did not receive processing through the disability evaluation system ("DES"), which is required for a discharge purportedly based on medical unfitness.  *Id.* ¶ 106; *see* AFI 48-123 ¶ 5.2 (ECF 1-9).  Doe's DD-214 also originally listed him as a commissioned Second Lieutenant; a subsequent administrative correction amended his rank to "AF Cadet."  ECF 33 ¶ 104.

## III.   ARGUMENT

### A.   Plaintiffs' Claims Are Justiciable and Satisfy the *Mindes* Framework

First, Defendants argue that this Court lacks subject matter jurisdiction because it is powerless to evaluate their accessions, retention, and deployment policies, which they claim are nonjusticiable "quintessential military judgment[s] about the qualifications necessary for appointment as a commissioned officer."  ECF 42-1 at 5 (citing *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971)).  But these are the same arguments—regurgitated almost word for word—that were advanced by defendants in *Roe*[7] and a related case, *Harrison v. Spencer*, No. 18-641 (E.D. Va.)[8], and rejected by both the Eastern District of Virginia and the Fourth Circuit.

To determine whether a case involving military decisions is justiciable, courts in this circuit apply the *Mindes* framework.  *See Roe*, 947 F.3d at 220; *Guerra v. Scruggs*, 942 F.2d 270, 276 (4th Cir. 1991).  As a threshold matter, "a justiciable case challenging a military action must allege 'the deprivation of a constitutional right, or ... that the military has acted in violation of applicable

---

[7] Mem. in Supp. of Defs.' Mot. to Dismiss and Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 10–14, *Roe*, No. 18-1565 (E.D. Va. Jan. 25, 2019), ECF 50.

[8] Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. and Mem. in Supp. of Mot. to Dismiss at 18–22, *Harrison*, No. 18-641 (E.D. Va. Aug. 16, 2018), ECF 43.

statutes or its own regulations.'" *See Roe*, 947 F.3d at 218.  The plaintiff also "must have exhausted the available intraservice corrective measures." *Id.*  Defendants do not dispute that Plaintiffs' Amended Complaint satisfies these two threshold requirements.  ECF 33 ¶¶ 111–61, 175–92.

Where these requirements are met, the Court determines whether a case involving military decisions is justiciable by balancing: (1) the "nature and strength" of the plaintiff's claim; (2) the "potential injury to the plaintiff if review is refused"; (3) the "type and degree of anticipated interference with the military function"; and (4) the "extent to which the exercise of military expertise or discretion is involved." *Roe*, 947 F.3d at 218 (quoting *Mindes*, 453 F.2d at 201–02). Each of the four *Mindes* factors supports judicial review here.[9]

### 1.     The Nature and Strength of the Claims Warrant Judicial Review

The military policies and actions challenged here are similar or—for some claims— identical to those that the Fourth Circuit found justiciable and likely to succeed in *Roe*.  Plaintiffs allege that when they "attempted to commission as officers while living with HIV, each faced an ill-informed, categorical bar banning [them] from continuing his service."  ECF 33 ¶ 13.  The *Roe* plaintiffs similarly alleged they were discharged after facing a "categorical ban on deploying HIV-positive service members."  947 F.3d at 22.  The plaintiffs in both cases also alleged that the defendants failed to follow their own policies and regulations permitting retention and deployment (for Roe, *see Roe*, 947 F.3d at 219–20) or commissioning and deployment (for Deese and Doe, *see* ECF 33 ¶¶ 111–28) of HIV-positive service members who are fit for duty and permitted to deploy or commission with a waiver or ETP.

Given their similarities, the strength of Plaintiffs' claims mirror those in *Roe*, where the

---

[9] Defendants concede that *Mindes* does not apply to Doe's equitable estoppel claim.  ECF 42-1 at 32 (citing *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989)).

Fourth Circuit concluded that "Plaintiffs have shown they are likely to succeed on their claim that the Government violated the APA by acting arbitrarily or capriciously" in two alternative ways: (1) by discharging the plaintiffs and those similarly situated "without an individualized assessment of each servicemember's fitness, instead predicting they could not deploy as a result of their HIV status," or (2) if the policies in fact "render the service members *categorically* ineligible to deploy," as their jobs require, "the Government [did] not—and cannot—reconcile these policies with current medical evidence." *Id.* at 219–20 (emphasis added). Here, too, Plaintiffs were discharged "for reasons unrelated to their ability to serve"—the foundational principle of *Roe*. ECF 42-1 at 27 (citing 947 F.3d at 218).

Defendants hardly dispute that Plaintiffs have satisfied the first *Mindes* factor. They claim only that Plaintiffs do not enjoy a likelihood of success based on the purported "detailed, longstanding, and evidenced-based explanations provided for the rules, policies, and decisions at issue." *Id.* at 24; *see also id.* at 13–14. But the "explanations" provided by Defendants in the 2018 DoD Report and again here have been roundly rejected. Indeed, the Fourth Circuit held that "each explanation offered by the Government [in the 2018 DoD Report] is unsupported by the record or contradicted by scientific evidence, leading us to conclude Plaintiffs have adequately shown that the Government failed to consider the relevant evidence and offers explanations so contrary to that evidence as to be arbitrary." *Roe*, 947 F.3d at 29.

Given the Fourth Circuit's rejection of Defendants' justifications for their discriminatory policies, they are unable to meaningfully distinguish this case from *Roe*. And Defendants are simply wrong that "there are no allegations [here] that the accessions policy has been ... applied differently" among HIV-positive members "as compared to similarly disqualifying infectious diseases." ECF 42-1 at 28. Plaintiffs clearly allege that Defendants' policies, as well as the

16

application of those policies, "singl[e] out service members living with HIV for starkly different treatment" from those who are not living with HIV.  ECF 33 ¶ 13.  Indeed, the Air Force Instruction explicitly provides that, unlike for other disqualifying medical conditions, "[w]aiver for HIV infection is not authorized."  AFI 44-178 ¶ 2.2.1 (ECF 1-11 at 6).  In both cases, Defendants' policies, application of those policies, or both have categorically barred Plaintiffs from continuing their service based on HIV status alone.  ECF 33 ¶ 13.

The other component of the first *Mindes* factor (which Defendants ignore)—the "nature" of the claims—also favors justiciability.  453 F.2d at 201. Certain types of claims are considered more suitable for judicial resolution than others; the *Mindes* court concluded that "an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations" is justiciable.[10]  *Id.* ("Constitutional claims, normally more important than those having only a statutory or regulatory base, are themselves unequal in the whole scale of values.").  Here, too, the allegations raise no mere "haircut regulation question[]."  *Id.*  Plaintiffs challenge policies that arbitrarily and categorically barred them from serving in the military based on their HIV status alone—claims of a "nature" that this Court is well suited to resolve.  *See Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1097 (N.D. Cal. 2018) ("[t]here is a vast difference between judicial review of the constitutionality of a regulation ... and judicial review of a discrete military personnel decision" because "courts are

---

[10] The Supreme Court has reviewed the merits of constitutional challenges to military policies and decisions on many occasions.  *See, e.g.*, *United States v. Virginia*, 518 U.S. 515 (1996) (equal protection challenge to VMI's male-only admissions policy); *Goldman v. Weinberger*, 475 U.S. 503 (1986) (free exercise challenge to application of Air Force regulation restricting religious headgear); *Rostker v. Goldberg*, 453 U.S. 57 (1981) (equal protection challenge to all-male draft registration); *Brown v. Glines*, 444 U.S. 348 (1980) (First Amendment challenge to regulation of petitions on Air Force bases); *Parker v. Levy*, 417 U.S. 733 (1974) (vagueness and overbreadth challenges to criminal provisions of military code); *Frontiero v. Richardson*, 411 U.S. 677 (1973) (equal protection challenge to military benefits statutes that discriminated against women).

uniquely qualified to perform" the former, while the latter "involves a fact-specific inquiry into an area affecting military order and discipline" (quoting *Dibble v. Fenimore*, 339 F.3d 120, 127 (2d Cir. 2003))).

For these reasons, both the strength and the nature of Plaintiffs' claims strongly support judicial review.  *See Roe*, 947 F.3d at 218.

### 2.    Plaintiffs Have Suffered and Continue to Suffer Serious Injury

Incredibly, Defendants argue that "the passage of time reveals no grave injury" to Plaintiffs.  ECF 42-1 at 24.  Each of these distinguished men dedicated years of service to their country—and to these Defendants—as active duty enlisted or academy service members.  ECF 33 ¶¶ 17–18.  They dreamed of graduating as officers and excelled at their respective academies, only to be met with Defendants' illegal and unconstitutional actions.  *Id.* ¶¶ 6–10.  As a threshold matter, the suggestion that Defendants' decisions and ongoing refusal to commission Plaintiffs as officers do not constitute significant alleged injuries should be rejected—particularly given how much value Defendants undisputedly place in their own institutions and personnel.

Defendants try to evade judicial review by arguing the Court cannot compel Plaintiffs' commissions.  ECF 42-1 at 24.  But this mischaracterizes the nature of the relief Plaintiffs seek. Plaintiffs have requested declarations that, as a legal matter, they have already commissioned, or injunctions "directing the Department of Defense to commission them as an officer ... or, in the alternative, requiring the [branches] *to re-evaluate [them] in light of any order of this Court enjoining enforcement of the regulations" that tainted their respective commissioning processes*. ECF 33 at 44 (emphasis added).  Such relief does not require the Court to commission Plaintiffs. Rather, it requires Defendants to reconsider their decisions after modifying the unconstitutional aspects of their regulations.  *See Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987) ("Where it is alleged, as it is here, that the armed forces have trenched upon constitutionally

guaranteed rights through the promotion and selection process, the courts are not powerless to act."). The Court can also order Defendants to cease and rectify their illegal actions. *See Matlovich v. Sec'y of Air Force*, 591 F.2d 852, 859 (D.C. Cir. 1978) ("the federal courts have the power *and the duty* to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations" (emphasis added)); *see also, e.g.*, *Roe*, 947 F.3d at 231 (affirming injunction).

In any event, Defendants' reliance on *Orloff v. Willoughby* is misplaced. In *Orloff*, a conscripted doctor alleged that the Army wrongfully denied him a commission after he refused to take a loyalty oath or disavow Communist affiliations on Fifth Amendment grounds. 345 U.S. 83, 84–85, 89–90 (1953). Under those circumstances, the Supreme Court declined to order either his commission or discharge, reasoning that he could not "take the position that to tell the truth about himself might incriminate him and that even so the President must appoint him to a post of honor and trust." *Id.* at 90–91. Whatever viability *Orloff* still has—the Fourth Circuit subsequently directed a district court to grant a service member's motion to be commissioned or discharged on the same facts—it *did not* hold that a court could *never* enjoin a commission or discharge. *See Nelson v. Peckham*, 210 F.2d 574, 577–78 (4th Cir. 1954); *accord Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 19 (D.D.C. 2007) ("[T]he court rejects the Navy's contention that its personnel decisions are immune from judicial scrutiny where constitutional wrongs [in the accessions process] are alleged."). Indeed, in another case in which the Air Force cited *Orloff* to argue a claim was not justiciable, the court concluded: "[T]he court is not overly impressed with the Air Force's attempt to drape itself in bunting and dust off [*Orloff*]. The desire of the judiciary to avoid entanglement in military administration is strong, but no court today can avoid reasoned analysis of a serious constitutional claim under the catchphrase that judges do not run the army." *Vance v.*

19

*United States*, 434 F. Supp. 826, 833 (N.D. Tex. 1977).

Far from breaking the rules and then insisting that they be commissioned "upon [their] own terms" as in *Orloff*, Plaintiffs met (or exceeded) the requirements to commission and merely ask to be treated *the same as everyone else*. *Compare id.* at 90, with ECF 33 ¶¶ 37–39, 47, 58–59 (Deese), 73–74, 82, 85–89 (Doe). As in *Roe*, "This is not one servicemember's protest of a technical glitch in the military's decisionmaking process; it is a challenge claiming that HIV-positive service members, who wish to serve their country on equal terms with others, are being irrationally and arbitrarily swept from the ranks." 359 F. Supp. 3d at 407. To the extent Defendants suggest this Court cannot grant the relief Plaintiffs seek at all because "only the President" can grant a commission, they ignore the details: Doe *had* a commission but was later stripped of it. ECF 33 ¶¶ 84–90. And while both Plaintiffs met all of the requirements entitling them to a commission, they were deprived of it solely on the basis of their HIV status (*id.* ¶¶ 37–41, 58); further, both were wrongfully denied waivers or exceptions they would have obtained but for Defendants' unlawful policies or implementation of those policies (*id.* ¶¶ 61, 80, 83, 92).

Defendants' *Orloff*-based arguments have been rejected before, and in this same context. In *Harrison* and *Roe*, the district court properly rejected Defendants' argument that the court lacked the power to remedy their injuries. In *Harrison*, the Army and DoD argued "the Court [should] refrain from second-guessing [their] commissioning decisions" because under "*Orloff*[,] judicial interference in the commissioning process is not permitted." Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. and Mem. in Supp. of Mot. to Dismiss at 23, *Harrison*, No. 18-641 (E.D. Va. Aug. 16, 2018), ECF 43; *see also id.* at 22 & n.4 (commissioning is "expressly reserved for the President"). The court correctly concluded, however, "that deference does not mean that the military is immune from judicial review" of challenges to its discriminatory policies. Ex. F, Tr.

of Mot. Hr'g at 15:8-16, *Harrison*, No. 18-641 (E.D. Va. Sept. 14, 2018) (had the accessions policy at issue discriminated on the basis of race, "we'd strike that down in a heartbeat, and it wouldn't be any argument there that the Court didn't have the authority to do so").  Similarly, in *Roe*, the court found that the plaintiffs "made a strong demonstration that they face imminent, serious cognizable injuries because of defendants' policies."  359 F. Supp. 3d at 406.  In both cases, the court denied the government's motions to dismiss on nonjusticiability grounds.  *See id.* at 406, 409; Ex. F at 16:12-17.  This Court should follow suit.

Moreover, Defendants' refusal to commission Plaintiffs upon graduation is not the only serious injury alleged.  As a result of Defendants' actions, Deese has alleged "significant humiliating scrutiny into his private life and sensitive medical information by his classmates, fellow midshipmen, family, friends, and acquaintances."  ECF 33 ¶ 47.  Doe has alleged that Defendants "placed a stigma or purported disability on [him] that led to a change in Doe's status and foreclosed his freedom to take advantage of employment opportunities and by broadly precluding him from continuing in his chosen career" and "are more likely to result in the forced disclosure of Doe's HIV status in order to explain the discharge on his record."  *Id.* ¶ 156.

These are the exact types of injuries the Fourth Circuit has found to be "particularly heinous."  *Roe*, 947 F.3d at 229.  The *Roe* court held that the discharge of service members based on HIV status alone to be "further compounded by the stigma facing those living with HIV and the commonsense observation that HIV-positive service members, if discharged under these circumstances, will likely be forced to reveal their condition."  *Id.* (quoting 359 F. Supp. 3d at 419–20).  The court's analysis confirmed the very injury alleged here, explaining that because the plaintiffs "face[d] discharge earlier than expected," they "would have to address questions from others as to why they were not continuing in their intended careers."  *Id.* at 230.  These facts are

nowhere to be found in the Ninth Circuit cases cited by Defendants, in which the plaintiffs either had never been admitted into the military or had left voluntarily. *See* ECF 42-1 at 25 (citing *Khalsa v. Weinberger*, 779 F.2d 1393, 1399–1400 (9th Cir. 1985) (challenge to denial of enlistment), and *Sandidge v. Washington*, 813 F.2d 1025, 1025–26 (9th Cir. 1987) (plaintiff was no longer in National Guard but feared that a poor performance evaluation might harm his future job prospects)). In any case, it is the law in *this* Circuit that an illegal discharge based solely on HIV status *is* injurious. *Roe*, 947 F.3d at 229.

Finally, Defendants argue that Plaintiffs "are not facing any prospective adverse consequences, let alone imminent ones," as a result of their discharges. ECF 42-1 at 28. In addition to the fact that a "prospective" or "imminent" injury is not required under the second prong of *Mindes*, Defendants should not be permitted to use the injury they have already inflicted upon Plaintiffs as a shield to preclude judicial review of the very actions that caused it.

### 3. Judicial Review of Plaintiffs' Claims Does Not Interfere with the Military's Function or Discretion

The Fourth Circuit already rejected the argument Defendants raise in support of the third and fourth *Mindes* factors. *Roe*, 947 F.3d at 218–19. Defendants begin by making the blanket claim that "judicial interference in the commissioning process is not permitted." ECF 42-1 at 25. But this again overstates the narrow holding of *Orloff*. In fact, many courts have held that challenges to accession, commission, assignment, promotion, and discharge regulations are justiciable. *See, e.g.*, *Dillard v. Brown*, 652 F.2d 316, 323–24 (3d Cir. 1981) (regulation forbidding enlistment of single parents with minor dependent children); *Serv. Women's Action Network*, 320 F. Supp. 3d at 1094–97 (policies segregating females); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 192 (D.D.C. 2017) (accession and retention of transgender individuals), *vacated on other grounds sub nom., Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019); *Owens v. Brown*, 455 F. Supp. 291,

22

300 (D.D.C. 1978) (statute barring women from being assigned duties aboard Navy vessels); *Witt v. Dep't of the Air Force*, 739 F. Supp. 2d 1308, 1317 (W.D. Wash. 2010) (ordering reinstatement of officer after ruling that discharge based on sexual orientation violated constitution).

Defendants try to differentiate this case from *Roe*, arguing the court there "emphasized that the 'core of Plaintiffs' claims is an allegation that the Air Force failed to follow its own stated policies,' and merely requiring the Air Force to follow its own policies 'creates minimal interference with the military's function' and does not involve military expertise or discretion." ECF 42-1 at 27 (citing *Roe*, 2020 WL 110826, at *15–16). They claim this case is different because Plaintiffs would only gain relief if the Court struck down altogether the portions of Defendants' policies precluding service academy graduates with HIV from commissioning. *Id.* at 28. But Defendants are wrong both about the breadth of the *Roe* holding as well as Plaintiffs' potential avenues to relief in this case.

*First*, the *Roe* Court did not limit justiciable APA claims to only those that challenge Defendants' implementation of their own policies. To be sure, the court held plaintiffs were likely to prevail on their claim that the defendants acted arbitrarily and capriciously by "cutting short the individualized determination required by regulation." *Roe*, 947 F.3d at 228. But it *also* found the plaintiffs were likely to prevail on their APA claim because the defendants "impos[ed] an unjustified deployment policy at odds with modern science." *Id.* Specifically, the court held that "Plaintiffs are likely to succeed on the merits of this claim because the Government, by failing to offer an explanation that is reconcilable with the scientific and medical evidence available to it, did not comply with the APA in promulgating this policy." *Id.* at 225. As in *Roe*, Plaintiffs here have challenged the legality and constitutionality of Defendants' policies "categorically barring" those with HIV from commissioning and serving in various capacities (*see, e.g.*, ECF 33 ¶¶ 132,

23

134, 140, 142). The legal issues do not involve "special military expertise" (*see Roe*, 947 F.3d at 218–19), nor is the Court "being asked to engage in a task for which it has no competence." *Serv. Women's Action Network*, 320 F. Supp. 3d at 1097. Indeed, "[c]ourts regularly assess claims of disparate treatment under the Equal Protection Clause, and scrutiny of discrimination by the military is not uncommon." *Id.*; *see also Porter v. Califano*, 592 F.2d 770, 780 n.15 (5th Cir. 1979) ("courts, not agencies, are expert on" constitutional issues).

*Second*, while Plaintiffs certainly seek to strike down the discriminatory portions of Defendants' policies, that is not Plaintiffs' only avenue to relief. As in *Roe*, this case also challenges Defendants' "fail[ures] to abide by [their] own regulations and governing statutes in the process of summarily discharging [Plaintiffs]" without the individualized determinations to which they were entitled (*see, e.g.*, ECF 33 ¶¶ 112, 121). Defendants' own policies permit a waiver of "medical standards for appointment, enlistment, or induction into the Military Services," including for systemic conditions such as HIV. DoDI 6130.03 ¶ 4(b), Encl. 2 ¶ 3(b), Encl. 4 ¶¶ 1(a), 2, 24(b) (ECF 1-1 at 3, 8, 11, and 39); Ex. D at 4, USNA Instruction 6130.1B, ¶ 6(c)(1). Plaintiffs have alleged—and the administrative record confirms—that Plaintiffs were granted or, if Defendants had followed their own policies, would have been granted a waiver of commissioning standards or ETP by the individuals with authority to grant them. ECF 33 ¶¶ 111–28. Specifically, Deese was granted a waiver or would have been granted a waiver by the Superintendent of the USNA, Vice Admiral Walter E. Carter Jr., who supported his commissioning. *Id.* ¶¶ 53, 55, 61. Doe was granted or would have been granted a waiver—if permitted—by the USAFA Superintendent and SG, Lt. Gen. Michelle D. Johnson and Col. Walter Matthews, both of whom supported his commissioning. *Id.* ¶¶ 72, 80–81, 103. Plaintiffs further allege that their ETP requests would have been granted had the applicable regulations not been

applied in an arbitrary manner to categorically exclude all graduating HIV-positive service academy members based on HIV status alone.  *See id.* ¶¶ 44, 77, 83, 92–100, 126.  Doe further alleges that his ETP application was intercepted by the Air Force Chief of Staff, who is not even in Doe's line of authority, before it got to the appropriate authority, the Undersecretary for Personnel and Readiness.  ECF 33 ¶¶ 98, 126.  Thus, this case is justiciable for the independent reason that Defendants failed to follow their own policies, which would have resulted in Deese and Doe receiving their commissions.

Finally, Defendants warn the Court against "second-guess[ing] the military judgment as to which medical conditions are disqualifying for accession as an officer and which ones are not," lest "every candidate rejected for an officer's commission" file a civil lawsuit.  ECF 42-1 at 28.  But this concern is unfounded.  *Roe* preserved the limiting principle of *Mindes*: "a justiciable case challenging a military action must allege the deprivation of a constitutional right, or ... that the military has acted in violation of applicable statutes or its own regulations."  *See* 947 F.3d at 218 (quotation marks omitted).  This is no run-of-the-mill administrative challenge to a medical discharge.  Plaintiffs' claims attack a much graver injustice that satisfies the *Mindes* framework where other cases may not.  Based solely on their HIV status, Plaintiffs have been deprived of commissions they rightly earned, in violation of the APA and the Constitution.  And on top of that, Plaintiffs allege it was Defendants themselves—not this Court—who have "second guessed" and ignored the expertise and judgment of their own officers and medical personnel, including the individuals with authority to provide Plaintiffs a waiver to commission.  *See* ECF 33 ¶¶ 50–55, 78–82.

The Supreme Court and Fourth Circuit have recognized that "military interests do not always trump other considerations."  *Roe*, 947 F.3d at 219 (quoting *Winter v. Nat. Res. Def.*

*Council*, 555 U.S. 7, 26 (2008)).  For the reasons discussed, this case warrants judicial review.

> **B.      Deese Satisfies the Redressability Requirement of Article III Standing, Because Thrombocytopenia Does Not Preclude Commissioning Here**

Plaintiff Deese's claim is redressable despite his previous diagnosis of thrombocytopenia (low blood platelet count), which accompanied his HIV diagnosis six years ago.  N.A.R. at DeeseAR000016.  Defendants argue that thrombocytopenia is separately disqualifying, so a judgment in Deese's favor "w[ould] not redress the injury of not receiving an officer's commission."  ECF 42-1 at 31.  But this argument rests upon a flawed factual premise.

Thrombocytopenia is defined as a blood platelet count below 150,000 x $10^9$ per liter.  Ex. E, O'Bryan et al., *Impact of the Highly Active Antiretroviral Therapy Era on the Epidemiology of Primary HIV-Associated Thrombocytopenia*, 8 BMC RES. NOTES 595 (2015), at 3.  Notably, thrombocytopenia is secondary to and commonly accompanies an initial HIV diagnosis.  *Id.* at 1. Once an individual with HIV establishes a successful course of treatment, his or her thrombocytopenia is typically resolved.  *Id*.  That is exactly what happened in Deese's case, and his recent medical records confirm his blood platelet count is well within the normal range.  *See* Ex. B, Medical Records (showing blood platelet counts within normal range as of February 2018, January 2019, and October 2019).  Thus, his thrombocytopenia diagnosis from six years ago would not preclude his commissioning if he is awarded injunctive relief.

> **C.      Plaintiffs Have Alleged Viable Equal Protection Claims in Counts IX and X**

Although the Fourth Circuit did not need to reach the plaintiffs' equal protection claims to uphold the injunction in *Roe*, the district court found they "were likely to succeed on their claims that their discharges were ... irrational, in violation of [their] equal protection rights."  947 F.3d at 212, 225 n.3.  The district court in *Harrison* similarly denied a motion to dismiss the plaintiffs' claims that the military's accessions policies violated the Equal Protection Clause.  *Compare*

Compl. ¶¶ 71–78, *with* Ex. F at 16:12-17 (denying motion to dismiss).  This Court should follow suit and deny Defendants' motion to dismiss Plaintiffs' Count IX and X equal protection claims.

<p style="margin-left: 2em;">1.       <b>Plaintiffs Have Sufficiently Alleged That Defendants' Discriminatory Policies Will Not Survive Even Rational Basis Review</b></p>

Defendants' policies precluding HIV-positive individuals from becoming commissioned officers are not rationally related to any legitimate governmental interest, let alone the compelling interest required.  Even if this Court applies the rational basis framework for equal protection claims, that standard is not "toothless."  *Mathews v. Lucas*, 427 U.S. 495, 510 (1976); *see also Plyler v. Doe*, 457 U.S. 202, 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation."); *Roe*, 947 F.3d at 228 (government's asserted justifications based on "obsolete understandings cannot justify a ban").  Defendants fail to articulate a single justification for their policies that is not directly contradicted by Plaintiffs' Amended Complaint, wholly unrelated to the distinction between service members living with HIV and those who are not, or rejected outright in *Roe*.  *See* ECF 42-1 at 33–36.

There is no dispute that "the Armed Forces have a legitimate interest in ensuring that all service members are medically fit and ready to serve."  *Id.* at 33.  Defendants' constitutional problem arises because a service member's HIV diagnosis bears *no relationship* to their fitness, military readiness, effectiveness, or lethality.  *See* ECF 33 ¶¶ 183, 192; *see also id.* ¶ 9 (Doe found medically fit), ¶ 62 (Deese found medically fit).  "With access to basic health care, those found medically fit for duty continue to contribute meaningfully to the military."  *Id.* ¶ 3.  Defendants' three primary arguments to the contrary should be rejected.

*First*, Defendants' contention that "HIV has the potential to undermine a service member's medical fitness" (ECF 42-1 at 34) is contradicted by medical science and the opinions of Plaintiffs'

treating physicians.  *See* ECF 33 ¶ 57.  Plaintiffs have alleged that their asymptomatic HIV cannot "endanger the health of other personnel," because "a person with a suppressed viral load is incapable of transmitting HIV."  *Id.* ¶ 32; *see id.* ¶ 51 (Deese is "complian[t]" with "a consistently undetectable HIV viral load"), ¶¶ 72, 76, 82 (Doe deemed medically fit).  And the Fourth Circuit has already squarely rejected Defendants' other purported justifications: the need for "daily action," the risk of transmission through "blood transfusions and needle sticks," and "geographical area limitations."  *Compare* ECF 42-1 at 34, *with Roe*, 947 F.3d at 226–27 (rejecting assertions that "[t]reatment medications are highly specialized, and require constant, diligent compliance to be effective"; "austere conditions" in the field may disrupt treatment; and "battlefield blood transfusions" did not account for "current HIV treatment and transmission risks" because "a single daily pill" and testing "once or twice every year" are not "specialized"; symptoms do not return immediately after interruptions in treatment; and risks of transmission through transfusions and needle sticks are "unsupported by the record," as service members diagnosed with HIV do not donate blood, and risk of transmission through a needle stick are "even lower" than 0.23%).  Nor is the cost of medical care (*see* ECF 42-1 at 14) a legitimate basis for discrimination.  *See Mem. Hosp. v. Maricopa County.*, 415 U.S. 250, 263 (1974) (government may not "protect the public fisc by drawing an invidious distinction between classes").

*Second*, the "new leadership responsibilities and privileges" that a commission entails do not justify discrimination against service members with HIV.  ECF 42-1 at 35.  Defendants offer no reason why a commissioned officer with HIV could not "be [a] commanding officer[]" or "convene general courts martial."  *Id.*  Even more bewildering are Defendants' two thinly veiled attempts to denigrate Plaintiffs and others with HIV by suggesting that they lack "good moral character."  *See id.* at 33, 35.  Statements like these show that the stigma people living with HIV

still face is very real—and such thinking has been both recognized as pervasive and roundly rejected by the Fourth Circuit. *Roe*, 947 F.3d at 212 (criticizing outdated view linking HIV to "deviant lifestyle").

*Third*, the Fourth Circuit rejected Defendants' argument that the need to be able "to serve and deploy worldwide" justifies discrimination against Plaintiffs and other service members living with HIV. ECF 42-1 at 36. Categorically limiting deployment on the basis of HIV lacks a rational basis. *Roe*, 947 F.3d at 226, 234 ("The Government's explanations for why it has imposed an effective ban on deploying HIV-positive service members to CENTCOM's area of responsibility are at odds with modern science"—it "did not consider the realities" of a single-pill regimen, routine blood testing, and "extremely low" transmission risk and instead impermissibly relied on "assumptions and categorical determinations"). As it did in *Roe*, "the record contains no other justification for a categorical ban on deploying HIV-positive service members" worldwide. *Id.* at 226.

Defendants simply cannot cobble together a rational basis for their discriminatory policies by disputing Plaintiffs' well-pled (and supported) factual allegations, particularly at the motion-to-dismiss stage. *See Lucero v. Early*, 873 F.3d 466, 471 (4th Cir. 2017) (vacating a dismissal because the district court failed to "take account of the factual dispute" and determine the appropriate level of scrutiny to apply).

### 2. Plaintiffs Sufficiently Alleged That Heightened Scrutiny Should Apply

The district court in *Roe* declined to decide, at the preliminary injunction stage, whether discrimination on the basis of HIV status involves a suspect classification warranting heightened scrutiny, because it concluded that the plaintiffs were likely to succeed on their equal protection claim even under the lowest level of scrutiny. 359 F. Supp. 3d at 410 n.31. But Plaintiffs here have undisputedly *alleged* the requisite elements for an equal protection claim under heightened

scrutiny.  ECF 33 ¶¶ 180, 189.

Defendants' accession and commissioning policies treat service members living with HIV differently—and worse—than similarly situated people who do not have HIV.  *Id.* ¶¶ 177–78, 186–87.  At least heightened scrutiny is warranted where the government has singled out for disparate treatment a class that (1) has been "historically subject to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) lacks relative political power.  *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).  Plaintiffs have alleged with ample support that people living with HIV meet all of the criteria defining a suspect or quasi-suspect class.  ECF 33 ¶¶ 181, 190.

*First*, people living with HIV have suffered for decades through a unique history of misinformation, stigma, ostracism, and discrimination.  *Id.* ¶¶ 181(a), 190(a).  And because misconceptions, fear, and ignorance surrounding HIV are deeply rooted in the collective psyche, people living with HIV continue to suffer such treatment to this day.  *Id.* ¶¶ 3, 34; *see also id.* ¶¶ 18, 53 (alleging feelings of stigmatization).  That many people living with HIV choose not to publicly disclose their HIV status reflects the very real risk of the stigma and discrimination that people with HIV face (*see, e.g.*, *id.* ¶¶ 18, 47, 53), and in turn reinforces the insularity of the group.  *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) ("prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities").  The Fourth Circuit expressly recognized that stigma against people with HIV is prevalent even today and was a harm that the Court needed to guard against.  *See Roe*, 947 F.3d at 212, 229, 233–34.

*Second*, a person's HIV status bears no relation to their ability to contribute to society,

particularly in view of dramatic medical advances over the last three decades.  ECF 33 ¶¶ 181(c),

190(c).  Antiretroviral medications prevent the virus from replicating, and these therapies have

radically improved health outcomes for people living with HIV, who now enjoy about the same

life expectancy as anyone else.  *Id.* ¶¶ 3, 28–31.  "With access to basic health care, [service

members] found medically fit for duty continue to contribute ... just as any other service member

would."  *Id.* ¶ 3; *see Roe*, 947 F.3d at 226–28.  Plaintiffs are undoubtedly able to contribute to their

respective branches of the military despite their HIV status, which is why their commanding

officers and medical personnel all recommended that they be commissioned.  ECF 33 ¶¶ 50–52,

55, 78–83.  Indeed, Defendants' own policies confirm that service members whose HIV is

appropriately managed can still contribute effectively.  *See, e.g.*, DoDI 6485.01 at Encl. 3 ¶ 2(c)

(ECF 1-3 at 8);  SECNAV Instruction 5300.30E ¶ 3(c) (ECF 1-4 at 4);  AFI 44-178 ¶ 2.4

(ECF 1-11 at 6).

　　　*Third*, despite medical advances, HIV status remains an immutable characteristic.  Though

medical treatment can render a person's viral load undetectable (*id.* ¶¶ 3, 29), HIV is not yet

curable, and one cannot change his/her HIV status to obtain equal treatment.  *Id.* ¶¶ 181(d), 190(d).

　　　*Fourth*, people living with HIV are a discrete and insular group lacking sufficient political

power to protect their rights through the legislative process.  *Id.* ¶¶ 181(b), 190(b); *see Roe*, 947

F.3d at 212 ("The people most frequently diagnosed with AIDS belonged to marginalized and

stigmatized groups.").  A small minority of the overall population is currently living with HIV,

and they rarely choose to live openly, often fear disclosing their status, and continue to lack

representation at any level of the federal government.  ECF 33 ¶¶ 181(b), 190(b).  For the first

decade of the HIV epidemic, both the federal and state governments ignored or inadequately

provided for the needs of people living with (and at higher risk for) HIV.  *Id.*  Even today, many

with HIV still do not have access to care, and criminal laws continue to unfairly single out and discriminate against people with HIV.  *Id.*

The outdated case law Defendants cite does not foreclose Plaintiffs' claims from being subject to heightened scrutiny.  *See* ECF 42-1 at 32 (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261 (4th Cir. 1995)).  In *Doe*, a surgeon who had been diagnosed with HIV was fired because his employer believed he presented a significant risk to the health and safety of others.  50 F.3d at 1262.  The case largely turned on whether HIV was a disability, which was the prevailing view at the time but has since been undermined by scientific advances.  *See* ECF 33 ¶¶ 27–32. Recently, however, the Fourth Circuit recognized that HIV medicine has changed in ways that vitiate the findings in *Doe*, concluding that:  (1) "*Untreated* HIV can also be transmitted" through blood-to-blood contact, but "the risk is low ... for percutaneous needlestick injuries, the per-exposure risk is 0.23%"; (2) "[a]ntiretroviral therapy is effective for virtually every person living with HIV"; (3) "An HIV diagnosis was '[o]nce considered invariably fatal...' but now, HIV is a 'chronic, treatable condition'"; and (4) "risk of transmission from a person with an undetectable viral load through ... percutaneous needlestick injuries is very low, if such a risk exists at all." *Compare Roe*, 947 F.3d at 213–14 (quoting current CDC report), *with Doe*, 50 F.3d at 1265.

For these reasons, it is time to reconsider the level of scrutiny applied to classifications based on HIV status.  Including because "dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development," the Court should deny Defendants' motion to dismiss.  *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017).

### D.    Plaintiffs Have Alleged Viable APA Claims in Counts I–V

The APA permits courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A). An agency's action is not in accordance with law where "it is inconsistent with [its own] regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Defendants suggest that Plaintiffs' APA claims are limited to the administrative record and are, therefore, subject to a truncated summary judgment review. ECF 42-1 at 21–22. This is incorrect. Courts may go beyond the administrative record where (as here) the issues turn on "the reasons for the agency decision" (*Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)), or "whether all relevant factors were examined by an agency" in formulating the policy in question (*AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987)). *See*, *e.g.*, *Roe*, 947 F.3d at 220–21 (review of APA claims not limited to administrative record where issues turned on whether the defendants' policies and actions comported with medical science).

The Fourth Circuit affirmed the district court's conclusion in *Roe* that the plaintiffs "were likely to succeed on their claims that their discharges were arbitrary and capricious, in violation of the Administrative Procedure Act," in part because "any understanding of HIV that could justify" the ban there was "outmoded and at odds with current science." 947 F.3d at 212, 228. Particularly given this precedent, Plaintiffs have alleged viable APA claims here, and the Court should deny Plaintiffs' motion to dismiss or for summary judgment on these claims.

### 1. The APA Does Not Preclude Review of Plaintiffs' Claims

As a general matter, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *accord Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019). The "exception to judicial review is a 'very narrow one,' reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001) (quoting *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).  As Defendants readily acknowledge, these "rare circumstances" only arise when "a court would have no meaningful standard against which to judge the agency's exercise of discretion."  ECF 42-1 at 42 (citing *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

Defendants argue that their failure "to waive the relevant medical standards" for Plaintiffs is "not subject to challenge under the APA," because "Congress offered no further guidance to the Executive beyond limiting commissioned officer appointments to those individuals who are 'physically qualified for active service.'"  *Id.* at 42 (citing 10 U.S.C. § 532(a)(3)).[11]  This misstates both the Court's authority to review agency decisions and the standards against which their actions should be judged here.

Defendants' commissioning decisions are not unconditionally shielded from review under the APA simply because Congress gave broad authority to the Executive (under regulations prescribed by the Secretary of Defense) to determine who is "physically qualified for active service."  10 U.S.C. § 532(a)(3).  "[C]ourts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review."  *Casa De Maryland*, 924 F.3d at 699 (distinguishing *Heckler v. Chaney*, 470 U.S. 821 (1985), as dealing with "[n]onenforcement decisions" that "generally do not involve the exercise of '*coercive* power over an individual's liberty or property rights,' and, accordingly, do 'not in-fringe upon areas that courts often are called upon to protect'" (quoting *Heckler*, 470 U.S. at 832)).[12]  Importantly, the

---

[11] This justiciability argument relates only to Defendants' failure to follow their own regulations and commission Plaintiffs subject to a waiver or ETP from the appropriate authorities and is thus limited to Counts I and II of Plaintiffs' Amended Complaint, not their other APA claims in Counts III, IV, and V.

[12] Likewise, *Southern Railway Co. v. Seaboard Allied Milling Corp.*, also cited by Defendants (ECF 42-1 at 43), only considers the narrow exception to the presumption of reviewability for non-enforcement decisions.  442 U.S. 444, 454 (1979).

rules adopted by the body to which discretion has been vested can *also* serve as the standards against which agency action can be judged. *See Inova Alexandria Hosp.*, 244 F.3d at 347 ("Without deciding whether the statute supplies such a standard, we conclude that the Board's rule supplies a 'meaningful standard against which to judge the [Board's] exercise of discretion.'"). Thus, Defendants' attempt to limit this Court's review to the single "physically qualified" standard described in 10 U.S.C. § 532(a)(3) should be rejected.

This is not a situation in which the Court is faced with "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191. In fact, Defendants' regulations related to medical standards, medical evaluations, and non-arbitrary waiver processes for commissioning provide ample guidance for the Court to review its decisions categorically denying Plaintiffs' commissions based solely on their HIV status. Indeed, "[i]t is DoD policy to ... *[p]recisely* define any medical condition that causes a personal action, such as ... medical waiver," and "ensure that individuals under consideration for appointment, enlistment, or induction into the Military Services" are:

> (1)    Free of contagious diseases that probably will endanger the health of other personnel.
>
> (2)    Free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from the Service for medical unfitness.
>
> (3)    Medically capable of satisfactorily completing required training.
>
> (4)    Medically adaptable to the military environment without the necessity of geographical area limitations.
>
> (5)    Medically capable of performing duties without aggravation of existing physical defects or medical conditions.

DoDI 6130.03 ¶ 4(b)-(c) (ECF 1-1 at 3) (emphasis added). While Defendants' regulations identify a comprehensive list of disqualifying medical conditions (*Id.* at Enc. 4 ¶¶ 2–31 (ECF 1-1 at 11–51)), they also provide a process by which graduates of the Navy and Air Force academies may

seek a waiver of "medical standards for appointment ... into the Military Services," including for systemic conditions such as HIV.  DoDI 6130.03 ¶ 4(b), Encl. 2 ¶ 3(b), Encl. 4 ¶¶ 1(a), 2, 24(b) (ECF 1-1 at 3, 8, 11, and 39); Ex. D at 4, USNA Instruction 6130.1B, ¶ 6(c)(1); AFI 48-123 ¶ 6.3 (ECF 1-9 at 45), Attach. 2, Table A2.1 (ECF 1-9 at 91–94).  Defendants' regulations also provide a comprehensive process by which officer candidates with potentially disqualifying medical conditions will be reviewed by medical evaluation boards and physicians to help inform waiver decisions so that they are not made in an arbitrary manner untethered to medical evidence.  Ex. D at 4, USNA Instruction 6130.1B, ¶ 6(c)(1); AFI 48-123 ¶ 6.4.6 (ECF 1-9 at 49–50).

Given the multitude of military regulations, policies, procedures, and instructions cited by Plaintiffs here and throughout their Amended Complaint, meaningful standards undoubtedly exist to guide the Court's review of Defendants' actions, as the Fourth Circuit recognized in finding the plaintiffs in *Roe* were likely to succeed in establishing Defendants' policies were arbitrary and capricious.  947 F.3d at 225.

### 2. Plaintiffs Have Sufficiently Alleged Violations of the APA in Counts I–V

The promulgation of the military's HIV policies regarding the categorical discharge of service academy graduates living with HIV—as well as their application to Plaintiffs in this case— were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." ECF 33 ¶¶ 111–153; 5 U.S.C. § 706(2)(A).  Specifically, Plaintiffs claim that Defendants violated the APA by:

(1)     applying their HIV policies to categorically bar USNA midshipmen and USAFA cadets living with HIV from commissioning as officers (Counts III, IV, and V);

(2)     not recognizing the USNA Superintendent and USAFA/SG as the authorities to decide medical waivers or the Undersecretary of Defense for Personnel and Readiness as the authority to grant an ETP (Counts I and II); and

    (3)    not processing Plaintiff Doe through the DES (Count II).[13]

ECF 33 ¶¶ 111–153.[14]

To comply with the APA, the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43). Although arbitrary-and-capricious review of APA claims is necessarily deferential, the standard "does not reduce judicial review to a rubber stamp." *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018) (citation omitted). Finally, consistent with this standard and to avoid being arbitrary and capricious, an agency "must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (citation omitted).

        a)    **Plaintiffs Have Sufficiently Alleged in Counts III, IV, and V That Defendants' Policies Categorically Barring Service Members with HIV from Commissioning Violate the APA**

In Counts III, IV, and V, Plaintiffs allege that Defendants violated the APA, because their categorical prohibition on the commissioning of service academy graduates with HIV is: (i) contrary to the science of HIV treatment and prevention and, therefore, arbitrary, and

---

[13] Defendants concede that Doe should have been processed through the DES. ECF 42-1 at 6 n.2.

[14] Plaintiffs withdraw their allegation that DoDI 6485.01 was required to have been published in the *Federal Register* and put through notice-and-comment rulemaking, ECF 33 ¶ 150.

capricious; and (ii) inconsistent and in conflict with military regulations governing the accession

or retention of active duty service members with HIV and, therefore, not in accordance with law.[15]

ECF 33 ¶¶ 129–53.  Each is an independent basis for Plaintiffs' APA claims in Counts III, IV, and

V.

Defendants argue that Plaintiffs' claims cannot survive because "[t]he military's judgment"

in barring HIV-positive service members from commissioning is "plainly the product of reasoned

decisionmaking."  ECF 42-1 at 48.  But this is *ipse dixit*. As discussed above, the 2018 DoD Report

Defendants rely on for this proposition was flatly rejected by the Fourth Circuit, which recognized

that the 2018 DoD Report did not engage with the medical evidence in a meaningful way.  *See*

*supra* at 16–17.  The *Roe* court found that "any understanding of HIV that could justify" a

---

[15] Defendants also argue that Deese's challenge to SECNAV Instruction 5300.30E (ECF 1-4) is barred by the statute of limitations, because that policy issued on August 13, 2012, just over six years before this lawsuit was filed on August 28, 2018.  ECF 42-1 at 44 n.16.  The Court should reject this argument.

First, Deese did not suffer a legally cognizable injury until his May 2017 discharge.  ECF 33 ¶ 56.  The APA undisputedly contemplates an individual right of action, and he could not file suit until that time.  *See* 5 U.S.C. § 702 (2012) ("*A person* suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... is entitled to judicial review thereof.") (emphasis added)).

Second, even if Deese's challenge might otherwise be barred, "[t]he Supreme Court has suggested that there may be some exceptional cases where judicial review of agency action would always be available, even if Congress did not specifically authorize it (through the APA or otherwise) or actually precluded it explicitly, or at least that there are certain areas where the presumption in favor of judicial review is particularly strong.  The two chief areas of this sort appear to be constitutional claims ... and claims by a party facing a governmental action against it for violating regulations or laws whose applicability or validity it wishes to challenge."  *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 461 n.3 (4th Cir. 1999) (citations omitted) (collecting cases).

Third, the Navy *re-issued* this instruction in December 2018 with an identical provision categorically barring Deese from commissioning based on his HIV status alone.  *See* Ex. C, SECNAVINST 5300.30F ¶ 4(a) ("Applicants for appointment, enlistment, or pre-appointment who are HIV antibody positive are not eligible for entry into the military services.").  Undisputedly, the statute of limitations would not bar Deese's challenge to this identical provision preventing him from commissioning.

categorical ban on deploying service members "is outmoded and at odds with current science," and therefore arbitrary and capricious.  947 F.3d at 228.

Defendants try to evade the Fourth Circuit's holding by distinguishing the plaintiffs in *Roe*, who are active duty service members subject to retention standards, from Plaintiffs here, who were active duty service members attempting to commission pursuant to accession standards. ECF 42-1 at 46–47.  But this misses the point.  At best, Defendants provide an explanation for having certain "differences between accession and retention" standards in the military *generally*, and "for utilizing the accession medical standards when determining one's eligibility for an officer's commission." *Id.*  But they still fail to provide "a rational connection between the facts" concerning HIV treatment and prevention and "the choice made" to institute a categorical ban discharging active duty service members living with HIV—regardless of whether the ban is implemented under retention or accession standards.  *State Farm*, 463 U.S. at 43.  Indeed, to avoid being arbitrary and capricious, an agency "must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Kreis*, 406 F.3d at 687 (citation omitted).  Here, Defendants have provided no legitimate or medically based reason for the arbitrary difference between retention and accession standards when it comes to HIV *specifically*. Certainly, Plaintiffs have sufficiently alleged that there is no reason supported by science, and the Fourth Circuit has agreed.

Defendants' application of their challenged policies is also inconsistent and in conflict with other military regulations governing active duty service members with HIV.  Defendants argue their accession policies are merely "inharmonious" with their retention policies for service members with HIV, and that "this dissonance is amplified" by the fact that service academy midshipmen and cadets are considered to be on "active duty."  ECF 42-1 at 47.  But this is more

than "dissonance."  As discussed above, graduates of the service academies with HIV are on "active duty," yet are not evaluated under the retention standards afforded all other active duty service members with HIV—despite Defendants' failure to articulate medically sound reasons for the difference.  DoD regulations further *permit* a waiver for service academy graduates with HIV to commission.  DoDI 6130.03 Encl. 2 ¶ 3(b) (ECF 1-1 at 8); Encl. 4 ¶¶ 1(a) (ECF 1-1 at 11); Encl. 4 ¶ 24(b) (ECF 1-1 at 39).  Yet AFI 44-178 is in conflict, singling out HIV as a condition where waiver is not authorized.  *Id.* ¶ 2.2.1 (ECF 1-11 at 6).  Like DoD instructions, Navy regulations permit a waiver for service academy graduates with HIV to commission.  Ex. D at 4, USNA Instruction 6130.1B, ¶ 6(c)(1); *id.* at 6, Encl. 1; USNAINST 1301.5F ¶ 5(a)(1)(a) (ECF 1-7 at 3).  But the Navy's actions in discharging Deese were not consistent with those regulations, as he was discharged despite support for a waiver from Superintendent Carter—the individual granted waiver authority for Deese's commissioning.  *Id.*; ECF 33 ¶ 55.  These inconsistencies further emphasize the arbitrary and capricious nature of Defendants' challenged policies.

> **b)** **Plaintiffs Have Sufficiently Alleged in Counts I and II That Defendants Violated the APA by Not Recognizing Waivers from, or Submitting ETPs to, the Appropriate Authorities**

In Counts I and II, Plaintiffs allege that Defendants violated the APA because they failed to abide by their own regulations recognizing the USNA Superintendent and the USAFA/SG as the appropriate authorities to decide whether Plaintiffs Deese and Doe, respectively, would receive waivers to commission.  ECF 33 ¶¶ 111–28.  Defendants further failed to submit Plaintiffs' requests for an ETP to the Undersecretary of Defense for Personnel and Readiness, who was both the author of DoDI 6485.01 establishing DoD policy to deny eligibility for appointment to individuals with HIV, and also the person responsible for policy implementation for "management of service members with HIV."  *Id.* ¶¶ 44, 77; DoDI 6485.01 ¶¶ 1-7 (ECF 1-3 at 2-3); *id.* at Encl. 2 ¶ 1(a) (ECF 1-3 at 6).

"When the question before the court is whether an agency has properly interpreted and applied its own regulation, the reviewing court must give the agency's interpretation 'substantial deference.'  But '[d]eference, of course, does not mean blind obedience,' and no deference is due if the agency's interpretation 'is plainly erroneous or inconsistent with the regulation.'"  *Md. Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340, 343 (4th Cir. 2002) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512, and *Garvey v. NTSB*, 190 F.3d 571, 580 (D.C. Cir. 1999)).

DoDI 6130.03 provides that the "Secretaries of the Military Departments and Commandant of the Coast Guard shall ... [a]uthorize the waiver of the [medical] standards in individual cases for applicable reasons and ensure uniform waiver determinations."  DoDI 6130.03 Encl. 2, ¶ 3(b) (ECF 1-1 at 8).  Defendants suggest that, based on this provision, *only* the Secretaries of the Navy and Air Force could have authorized a medical waiver for Plaintiffs Deese and Doe, respectively.  ECF 42-1 at 45–46.  But of course, the Secretaries of each of the branches of the Armed Services do not personally make medical waiver determinations for every member or prospective member of the armed forces living with HIV.  Their authority is delegated.  *See, e.g.*, AFI 48-123 ¶ 6.3 (ECF 1-9 at 45); *id.* at Attach. 2, Table A2.1 (ECF 1-9 at 91–94) (delegating waiver authority for initial commissioning of USAFA cadets to the USAFA/SG).

USNA Instruction 6130.1B provides that the Superintendent of the USNA is authorized to grant a waiver and commission midshipmen living with HIV.  *See supra* at 7; Ex. D at 4 USNA Instruction 6130.1B, ¶ 6(c)(1); *id.* at 6, Encl. 1; USNAINST 1301.5F, ¶ 5(a)(1)(a) (ECF 1-7 at 3).  Neither DoD nor Navy regulations *prevent* a waiver from being authorized for HIV in order to commission a graduating midshipman.  And Deese has alleged—and there is no dispute—that the Superintendent of the USNA would have provided a waiver for Deese to commission had he not been prevented from doing so by Defendants.  ECF 33 ¶¶ 115–16.

41

During his recent DES processing, the Physical Evaluation Board continued to misapply the applicable Naval Instructions.  The PEB concluded, "since the member has a condition which precludes commissioning and BUMED has not issued a waiver for that condition, the only conclusion permitted to the [Physical Evaluation Board] is UNFIT."  Ex. A at 4.  But it is not BUMED that is authorized to issue a waiver to commission USNA graduates—it is the USNA Superintendent.  While BUMED submits its recommendation to the Superintendent, "[a]s the commissioning authority, the Superintendent may choose to waive a medical commissioning standard, *even against medical recommendation(s)*, and *commission any midshipman*."  Ex. D at 4, USNA Instruction 6130.1B ¶ 6(c)(1) (emphasis added); *see also id.* at 6, Encl. 1; USNAINST 1301.5F ¶ 5(a)(1)(a) ("BUMED will make recommendations for medical waivers ... Only the Superintendent may designate a midshipman not physically qualified (NPQ) for commissioning.") (ECF 1-7 at 3).  Here, Defendants prevented the USNA Superintendent from issuing a waiver as authorized.

AFI 48-123 provides that the Air Force Academy's chief medical officer, the USAFA/SG, is authorized to grant a waiver and commission Air Force cadets with disqualifying medical conditions.  *See supra* at 7; AFI 48-123 ¶ 6.3 (ECF 1-9 at 45); *id.* at Attach. 2, Table A2.1 (ECF 1-9 at 91–94).  In the case of Doe, there is likewise no question that the USAFA/SG would have provided a waiver for Doe to commission had he not been prevented from doing so by Defendants, including through implementation of AFI 44-178, which arbitrarily singles out HIV as a medical condition that is not authorized to be waived (which should be struck down for the reasons discussed above).  ECF 33 ¶¶ 123, 139–40.

Moreover, both Plaintiffs' efforts to seek an exception to DOD's policy denying eligibility for appointment to individuals with HIV were also stymied by Defendants.  They did not permit

Plaintiffs' ETP requests to be considered by the author of DoDI 6485.01 and the individual responsible for "management of service members with HIV," the Undersecretary of Defense for Personnel and Readiness.  ECF 33 ¶¶ 44, 77; DoDI 6485.01 ¶¶ 1-7 (ECF 1-3 at 2-3); *id.* at Encl. 2 ¶ 1(a) (ECF 1-3 at 6).  Indeed, Doe's ETP application was intercepted by the Air Force Chief of Staff, who is not even in Doe's line of authority.  ECF 33 ¶ 126.  Both Plaintiffs' ETP requests were summarily denied without consideration by the Undersecretary on the basis of their HIV status alone, despite—in the case of Doe—acknowledging that the Undersecretary was the authority to grant an ETP.  *Id.* ¶¶ 44, 98; *see generally* A.R. at 003 (discussing option to "sign a memo requesting that USD(P&R) [Undersecretary of Defense for Personnel and Readiness] grant an exception to the accession policy outlined in DoDI 6485.01") A.R. at 007–10 (noting improper delegation to the Secretary of the Air Force, Manpower and Reserve Affairs); N.A.R. at DeeseAR000004–6 (no indication that the Undersecretary of Defense for Personnel and Readiness considered Deese's ETP).

The administrative records make clear that significant confusion existed amongst Navy and Air Force personnel regarding how to handle Plaintiffs' commissioning.  Plaintiffs have sufficiently alleged that Defendants failed to abide by their own regulations, resulting in Plaintiffs' discharge.  Thus, Counts I and II cannot be summarily determined in Defendants' favor.

### E.    Doe Has Alleged a Viable Procedural Due Process Claim in Count VI

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  If so, courts "look to see if the [government]'s procedures comport[ed] with due process."  *Id.*  Here, Doe asserts a protected liberty interest premised on the DoD's false statement that he is medically

unfit for duty, causing him to face social stigma and/or forced disclosure of his HIV status.  ECF 33 ¶ 160.

Doe's allegations reflect recognized interests in liberty "to engage in any of the common occupations of life" and "the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."  *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007); *accord Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006); *McNeill v. Butz*, 480 F.2d 314, 319 (4th Cir. 1973).  These interests are "implicated by [a public employer's] public announcement of reasons for an employee's discharge."  *Sciolino*, 480 F.3d at 645–46; *accord Ridpath*, 447 F.3d at 307; *McNeill*, 480 F.2d at 319.

To claim a "stigma-plus" liberty interest, a plaintiff must allege "that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false."  *Sciolino*, 480 F.3d at 646.

Defendants do not dispute that Doe sufficiently alleged the first three elements.  As to the fourth element, Defendants argue that because Doe "admits" he has HIV, statements to that effect are not false.  ECF 42-1 at 38–39.  But Defendants focus on the wrong statement:  the alleged falsity is not that Doe has HIV; it is that he is *medically unfit for duty*.  *See, e.g.*, ECF 33 ¶ 158.

DoDI 6130.03 ¶ 4(c) (ECF 1-1 at 3) defines a "physically qualified" service member to be:

(1)    Free of contagious diseases that may *endanger the health of other personnel*;

(2)    Free of medical conditions or *physical defects* that may reasonably be expected to *require excessive time lost from duty ...* ;

(3)    *Medically capable* of satisfactorily completing required training and initial period of contracted service;

(4)    *Medically adaptable* to the military environment without geographical area limitations;

(5)     *Medically capable* of performing duties without aggravating existing physical defects or medical conditions (emphases added).

Defendants argue that Doe does not, in fact, meet these criteria, because his HIV may (i) endanger the health of other personnel through "potential communicability," (ii) prevent him from being adaptable to the military environment of "extremely austere and dangerous places worldwide," or (iii) aggravate existing medical conditions due to "even well-managed HIV infection ... risks of complications and comorbidities."   ECF 42-1 at 14 (quoting ECF 42-3 at 12).   Defendants' challenged policies and their discharge of Doe reflect these assumptions and statements about his purported medical unfitness for duty.   But these statements have been rejected by the Fourth Circuit as "unsupported by the record or contradicted by scientific evidence."   *See Roe*, 947 F.3d at 225. It therefore follows that Defendants' determination that Doe was medically unfit for duty is "unsupported by the scientific evidence"—i.e., false—as well.

Having been deprived of a constitutionally protected interest, Doe did not receive the due process to which he was entitled under the Fifth Amendment.   First, it is uncontested that Doe did not receive the DES processing to which he was entitled *before* his discharge (ECF 42-1 at 36), and Defendants' *post-hoc* offer to provide the requisite process does not satisfy its constitutional duty to provide "*prior* notice."   *Connecticut v. Doehr*, 501 U.S. 1, 24 (1991) (emphasis added) (holding that risk of "erroneous deprivation" of property interest is "substantial" in the absence of prior notice and hearing).   Second, the Fourth Circuit held in *Roe* that the policies underlying that process are arbitrary, capricious, and unsupported by scientific evidence.   947 F.3d at 225.   A policy may be "so arbitrary and capricious" that it "violate[s] the Due Process Clause of the Fifth Amendment"—and Defendants' policies do.   *See United States v. Hemme*, 476 U.S. 558, 559 (1986).

### F.   Doe Has Alleged a Viable Equitable Estoppel Claim in Count VII

Doe's allegations in Count VII meet the requirements for an equitable estoppel claim. After being diagnosed with HIV in February 2014 during a routine Air Force Academy physical, he was told six months later that he was eligible to take a commitment oath to serve an additional two years on active duty at the Academy, followed by five more as a commissioned officer. ECF 33 ¶¶ 68, 73.  He took that oath and received the standard "commitment packet."  *Id.* ¶¶ 73–74.  In April 2016, the Air Force issued orders that Doe was to begin his duties as a commissioned Second Lieutenant and contracting officer no later than August 6, 2016.  *Id.* ¶ 84.  And on graduation day, June 2, 2016, Doe received a certificate of commissioning signed by the Secretary of the Air Force, stating he had been commissioned as a Second Lieutenant as of that date.  *Id.* ¶¶ 85–86.  He then took the oath of office and was listed among other newly commissioned Second Lieutenants on a document signed by the Secretary of Defense, completing the commissioning process. *Id.* ¶¶ 87–89.  Given these facts, Doe has stated a plausible claim that his discharge should be equitably estopped on the grounds that Defendants engaged in affirmative misconduct in leading him to reasonably believe, to his detriment, that he was eligible to (and did) commission.

Contrary to Defendants' suggestion, equitable estoppel can be asserted affirmatively against the government—and the military—if a plaintiff can show (1) "affirmative misconduct going beyond mere negligence" that (2) "will cause a serious injustice."  *Watkins v. U.S. Army*, 875 F.2d 699, 706–07 (9th Cir. 1989) (en banc) (allowing estoppel claim to be asserted against military); *see, e.g.*, *Sun Il Yoo v. INS*, 534 F.2d 1325, 1329 (9th Cir. 1976) (government's conduct was "analogous to the entrapment of a criminal defendant"); *Fox v. Morton*, 505 F.2d 254, 256 (9th Cir. 1974) (plaintiffs asserted estoppel claim against government, alleging entitlement to hearing prior to the termination work program); *Thakkar v. United States*, 389 F. Supp. 3d 160, 165, 179 (D. Mass. 2019) (plaintiff raised APA, constitutional, and estoppel claims against DoD

46

and Department of Homeland Security, alleging they withheld adjudication of his naturalization application after he relied on their representations).

"[A]ffirmative misconduct" is fact- and case-specific. *Akbarin v. INS*, 669 F.2d 839, 845 (1st Cir. 1982). It "require[s] an affirmative misrepresentation or affirmative concealment of a material fact by the government," but a plaintiff need not show "inten[t] to mislead." *Watkins*, 875 F.2d at 707. Affirmative misconduct can be established where "government officials gave [plaintiffs] incorrect information." *See United States v. Wharton*, 514 F.2d 406, 412 (9th Cir. 1975) (estoppel applied in public lands case, where occupants facing ejectment had reasonably relied on government's representations as to how they could gain title). Once the plaintiff has shown affirmative misconduct, he must then show that the misconduct has "threaten[ed] to work a serious injustice" such that "the public's interest will not suffer undue damage" by imposing liability." *Watkins*, 875 F.2d at 707. If so, the "threshold requirements for estopping the government are satisfied," and the court may "decid[e] whether the traditional elements of estoppel are present." *Id.*; *see also Johnson v. United States*, 610 F. Supp. 2d 491, 498 (D. Md. 2009) (estoppel appropriate where (1) a party's voluntary misrepresentation (2) is relied upon by the other party (3) to his detriment (citing *Chawla v. Transam. Occidental Life Ins. Co.*, 440 F.3d 639, 646 (4th Cir. 2006))).

*Watkins* is instructive. With "full knowledge" that the plaintiff ("an outstanding soldier") was openly gay, the Army repeatedly permitted him to reenlist over the course of 14 years "despite its longstanding policy that homosexuality was a nonwaivable disqualification for reenlistment" at that time. 875 F.2d at 701. After the Army changed course and discharged him, the district court enjoined the discharge on the basis of estoppel, and the Ninth Circuit affirmed *en banc*. *Id.* at 702–05. The court held that the Army's "affirmative[] misrepresent[ation] in its official records

47

throughout [the plaintiff's] fourteen-year military career that he was qualified for reenlistment" rose to the level of "affirmative misconduct," as it had "affirmatively acted in violation of its own regulations when it repeatedly represented that [he] was eligible to reenlist." *Id.* at 707–08. Balancing the plaintiff's interests against the public's, the court concluded that his service had "greatly benefitted the Army," while "the harm to the public interest if reenlistment is not prevented is nonexistent." *Id.* at 708–09. Accordingly, estoppel was available, and the plaintiff had shown it: the Army knew he was gay, he had a right to rely on 14 years' worth of "acts amount[ing] ... to a policy of ignoring" that fact, and he had done so "to his injury." *Id.* at 709–11.

As in *Watkins*, Defendants' "conduct [here] went far beyond a mere failure to inform or assist"; they did not just "stand aside," but rather "acted affirmatively" in representing that Doe was eligible to commission: offering him confirmatory paperwork, administering the required oaths, and ordering him to a specific job placement. *Compare id.* at 708, *with* ECF 33 ¶¶ 73–75, 84–89. "[T]hese were ongoing active misrepresentations." *See Watkins*, 875 F.2d at 708.

The balance of interests favors allowing an estoppel claim here as well. "The injury to [Doe] from having relied on [Defendants'] approval of his military career—and being denied it now—is the loss of his career." *Id.* at 709. By contrast, "[t]he harm to the public interest if reenlistment [and commissioning are] not prevented is nonexistent" (*id.*)—every officer in Doe's chain of command and every senior officer at the academy, as well as all medical officers involved, support Doe's commission. ECF 33 ¶¶ 80–83. And "when the government deals carefully, honestly and fairly with its citizens, the public interest is likewise benefited." *Watkins*, 875 F.2d at 709 (quotation marks omitted).

Like the plaintiff in *Watkins*, Doe has pled a plausible cause of action for estoppel.

Defendants knew about Doe's HIV (*see id.*), and they surely knew of their own policies regarding service members and cadets with HIV; the record contains no indication that those policies changed during the relevant period.  ECF 33 ¶¶ 26, 68.  They now argue that these policies bar Doe from commissioning and serving, yet they represented otherwise from at least August 2014 through 2016, when they encouraged him to pursue and complete the commissioning process.  *Id. at* ¶¶ 73–75, 84–89.  If Defendants are correct, they voluntarily misrepresented their position to Doe, and he reasonably relied to his detriment on those misrepresentations when he did not re-enlist when his original term of enlistment ran out (*id.* ¶ 75).  *See Johnson*, 610 F. Supp. 2d at 498.  "Regardless of what [Defendants] actually intended, [Doe] had a right to believe the [Air Force] intended him to rely on its acts," i.e., "the many 'green lights' he received."  *See Watkins*, 875 F.2d at 710–11.  Doe has plausibly alleged all the elements of a claim for equitable estoppel, and Defendants' motion to dismiss should be denied as to Count VII.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss for lack of subject matter jurisdiction or failure to state a claim and their alternative request for summary judgment and allow Plaintiffs' claims to proceed.

49

Dated: March 13, 2020                           Respectfully submitted,

                                                /s/ Zachary B. Cohen
Peter Perkowski*                                Zachary B. Cohen (Fed. Bar. No. 20159)
peter@modernmilitary.org                        Geoffrey P. Eaton*
Modern Military Association of America          Lauren Gailey*
P.O. Box 65301                                  zcohen@winston.com
Washington, DC 20035-5301                       geaton@winston.com
(Tel.): (800) 538-7418                          lgailey@winston.com
                                                WINSTON & STRAWN LLP
Scott A. Schoettes*                             1700 K Street, NW
SSchoettes@lambdalegal.org                      Washington, DC 20006
LAMBDA LEGAL DEFENSE AND                        (Tel.): (202) 282-5000
EDUCATION FUND, INC.                            (Fax): (202) 282-5100
105 W. Adams Street, Suite 2600
Chicago, IL 60603                               Bryce A. Cooper*
(Tel.): (312) 663-4413                          bcooper@winston.com
                                                WINSTON & STRAWN LLP
                                                35 West Wacker Drive
                                                Chicago, IL 60601
                                                (Tel.): (312) 558-5600

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing was filed electronically on March 13, 2020, in

accordance with the Court's Electronic Filing Guidelines.  Notice of this filing will be sent to all

parties by operation of the Court's Electronic Filing System.  Parties may access this filing

through the Court's Electronic Filing System.

*/s/ Zachary B. Cohen*
Zachary B. Cohen (Fed. Bar. No. 20159)
zcohen@winston.com
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(Tel.): (202) 282-5000
(Fax): (202) 282-5100

*Attorney for Plaintiffs*